# United States Court of Appeals
## For the First Circuit

No. 10-2341

UNITED STATES OF AMERICA,

Appellant,

v.

WILLIAM DOUGLAS,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MAINE

[Hon. D. Brock Hornby, U.S. District Judge]

Before

Boudin, Stahl and Howard,

Circuit Judges.

Margaret D. McGaughey, Appellate Chief, with whom Thomas E. Delahanty II, United States Attorney, was on brief for appellant.
David Beneman, Federal Defender, for appellee.
Judith H. Mizner, Assistant Federal Public Defender, Federal Defender Office, on brief for the Federal Public Defender for the Districts of Massachusetts, New Hampshire and Rhode Island, Amicus Curiae.

May 31, 2011

**BOUDIN**, <u>Circuit Judge</u>. In 2009, William Douglas and a co-conspirator engaged in a number of sales of cocaine base to an undercover agent in different locations in Maine. Thereafter, Douglas pled guilty to a one-count information charging him with conspiracy to distribute and to possess with intent to distribute more than 50 grams of cocaine base in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A) and 846 (2006).[1] Over the government's objection, the district court ruled in substance that the reduced mandatory minimums adopted by the Fair Sentencing Act of 2010, Pub. L. No. 111-220, 124 Stat. 2372 (the "FSA"), governed Douglas' sentence, and the government now appeals.

A chronology helps to set the stage. Douglas' crime comprised acts occurring at various times in 2009. Douglas' guilty plea occurred on January 11, 2010. The President signed the FSA and it went into effect on August 3, 2010. Among other changes, the new statute reduced in certain instances the mandatory minimum prison terms prescribed under prior law for violations involving cocaine base; it did so by increasing the drug quantity thresholds required to trigger the specific mandatory minimums. Implicitly,

---

[1]Section 841(a) makes illegal specified acts including distribution and possession with intent to distribute controlled substances (including cocaine base); section 846 makes conspiracies to do acts unlawful under section 841(a) a separate offense. By contrast, section 841(b) does not define a criminal offense: it lists the penalties, including maximum and in some cases minimum sentences, for specific quantities of specific drugs.

it altered the ratio between those mandatory minimums and the lesser ones prescribed for cocaine powder violations.

The old ratio was 100:1 and thus the five-year mandatory minimum was triggered for 5 grams of cocaine base or 500 grams of cocaine powder; the ten-year minimum was for 50 grams of cocaine base or 5 kilograms of powder. 21 U.S.C. § 841(b)(1)(A)(ii)-(iii), (b)(1)(B)(ii)-(iii) (amended 2010). The new statute triggered a five-year minimum for 28 grams of cocaine base (leaving powder at 500 grams) and a ten-year minimum for 280 grams of cocaine base (leaving powder at 5 kilograms). FSA § 2(a), 124 Stat. at 2372 (amending 21 U.S.C. § 841(b)(1)). In sum, the new minimums treat cocaine base more harshly than powder at a ratio of about 18:1 (500 divided by 28 is roughly 17.86).

Sentences for federal crimes ordinarily begin with calculations made pursuant to the federal sentencing guidelines that contain--along with other instructions--an elaborate table equating quantities of different drugs with different base offense levels. See United States v. Jiménez-Beltre, 440 F.3d 514, 518-19 (1st Cir. 2006) (en banc) (process); U.S.S.G. § 2D1.1(c) (2010) (table). When Congress first adopted mandatory minimums distinguishing between cocaine base and cocaine powder on the 100:1 basis, the Sentencing Commission guidelines also employed the 100:1 ratio, although the ratio fell somewhat after 2007 guidelines amendments. See Unfairness in Federal Cocaine Sentencing: Hearing

on H.R. 1459, H.R. 1466, H.R. 265, H.R. 2178 and H.R. 18 Before the Subcomm. on Crime, Terrorism, and Homeland Security of the H. Comm. on the Judiciary, 111th Cong. 47 (2009) (prepared statement of Hon. Ricardo H. Hinojosa, Acting Chair, U.S. Sentencing Commission).

The FSA did not amend the guidelines--a task ordinarily left to the Commission subject to congressional veto. Rather, the FSA directed the Commission to adopt new guidelines conforming to the new statute, FSA § 8, 124 Stat. at 2374 (to be codified at 28 U.S.C. § 994 note), evidently intending that the Commission, along with other changes, adjust its guidelines ranges for cocaine base to match the new 18:1 ratio. See Unfairness in Federal Cocaine Sentencing, supra, at 61.

The FSA directed the Commission to adopt these conforming guidelines on an emergency basis no later than November 1, 2010. FSA § 8, 124 Stat. at 2374. Consistent with what Congress expected, e.g., 156 Cong. Rec. H6197 (daily ed. July 28, 2010) (statement of Rep. Robert Scott); 156 Cong. Rec. S1680-81 (daily ed. Mar. 17, 2010) (statement of Sen. Richard Durbin), the Commission did adjust its guidelines table to correspond to the 18:1 ratio. The amendments took effect on November 1, 2010, significantly reducing the base offense levels for specific quantities of cocaine base.[2]

---

[2]See Notice of a Temporary, Emergency Amendment to Sentencing Guidelines, 75 Fed. Reg. 66,188 (Oct. 27, 2010); U.S.S.G. supp. to app. C, amend. 748 (Supp. 2010) (amending U.S.S.G. § 2D1.1(c))

In the period prior to November 1, 2010, the government and Douglas had been debating in the district court about the framework for determining his sentence. Under the mandatory minimums in effect at the time of Douglas' criminal acts in 2009, 50 grams or more of cocaine base triggered a mandatory minimum of ten years; but the district court contemplated a sentencing after November 1, when the guidelines table adjustments would create a base guidelines range for Douglas' quantity of cocaine base of only 78-97 months (which could be altered by other guidelines considerations).

By their own terms, guidelines changes are automatically retroactive in one limited sense: defendants, including those who committed their offense when prior guidelines were in effect, are sentenced under the edition of the guidelines in force at the time of sentencing (unless the new guidelines increase the sentence and raise ex post facto concerns). 18 U.S.C. § 3553(a)(4) (2006); U.S.S.G. § 1B1.11; United States v. Tejada-Beltran, 50 F.3d 105, 108 n.3 (1st Cir. 1995). As Douglas was to be sentenced after November 1, he sought the benefit of the new, lower guidelines shortly to come into force on that date.

---

(effective Nov. 1, 2010). The Sentencing Commission has re-promulgated the temporary, emergency amendments as permanent amendments, which will become effective, absent congressional action, on November 1, 2011. See Notice of Submission to Congress of Amendments to the Sentencing Guidelines, 76 Fed. Reg. 24,960, 24,963 (May 3, 2011).

On October 27, 2010, the district court concluded that Congress intended the new guidelines provisions to control from November 1 forward but also--and this is the heart of the dispute now before us--that by implication Congress intended the new mandatory minimums based on the same 18:1 ratio to supersede the higher mandatory minimums in effect in 2009 when Douglas' crime was committed. United States v. Douglas, 746 F. Supp. 2d 220, 231 (D. Me. 2010). On November 8, the court sentenced Douglas to 56 months in prison rather than to the ten-year mandatory minimum set by the pre-FSA drug statute. The government now appeals from the final judgment. Because this same issue will arise in many cases now pending, we expedited review.

The central issue presented is one of law reviewed de novo on appeal. The FSA does not address retroactivity questions at all and Congress, by inadvertence or design, may not have addressed the matter. See In re Grand Jury, No. 10-2005, 2011 WL 1227683, at *2 (1st Cir. Mar. 23, 2011). However, while the FSA itself does not expressly address retroactivity, a federal savings statute, 1 U.S.C. § 109 (2006), sets a general default rule where one statute supersedes another, providing in part that

> [t]he repeal of any statute shall not have the effect to release or extinguish any penalty, forfeiture, or liability incurred under such statute, unless the repealing Act shall so expressly provide, and such statute shall be treated as still remaining in force for the purpose of sustaining any proper action or

-6-

prosecution for the enforcement of such penalty, forfeiture, or liability.

Because "incurred" means "to which one is subject," United States v. Goncalves, No. 10-1367, 2011 WL 1631649, at *5 (1st Cir. Apr. 28, 2011), Douglas when he committed the criminal acts in 2009 became liable to the mandatory minimums then in effect unless in some fashion the FSA itself altered the calculus. Goncalves explained that--putting aside Congress' direction that new guidelines be promulgated--the FSA does not qualify the general rule of section 109, a position widely adopted in other circuits. Id. at *6-7. But, as Goncalves was sentenced before November 1, 2010, we reserved there the issue that is now before us. Id. at *5 n.5.

The decisions of other circuits do not by clear holdings decide the issue presented in this case.[3] The government says that section 109 subjects Douglas to the mandatory minimum that applied when his crime was committed because the FSA does not "expressly provide" otherwise and that the reduced guidelines ranges that became effective on November 1, 2010, are themselves superseded as to Douglas because the applicable mandatory minimum overrides the

---

[3]Many circuit court decisions hold that the FSA does not apply retroactively, Goncalves, 2011 WL 1631649, at *6 n.8 (collecting cases), but none we have discovered involves both a defendant sentenced after November 1 and explicit attention to--and rejection of--the specific kind of claim made by Douglas in this case. District court judges have addressed the precise issue and are divided. See United States v. Watts, C.A. No. 09-cr-300030-MAP, 2011 WL 1282542, at *11 (D. Mass. Apr. 5, 2011) (collecting cases).

guidelines.  See U.S.S.G. § 5G1.1(b); United States v. Sepulveda, 15 F.3d 1161, 1202 (1st Cir. 1993), cert. denied, 512 U.S. 1223 (1994).

The Maine district judge in this case, now joined by a Massachusetts district judge, Watts, 2011 WL 1282542, came to the opposite conclusion as to sentencings that occur on or after November 1, 2010.  Their reasoning is that Congress intended that when the new guidelines embodying the 18:1 ratio came into effect, defendants would be sentenced under the new guidelines, and use of the pre-FSA mandatory minimums with the 100:1 ratio would defeat this intention.  By contrast, use of the new mandatory minimums, set at the 18:1 ratio, creates no such conflict because they are generally aligned with the new guidelines table.

The Supreme Court has already held that the "express" language requirement does not require an explicit reference to section 109 or a special retroactivity provision.  Thus, the savings statute may be overridden "either by express declaration or necessary implication," Great N. Ry. Co. v. United States, 208 U.S. 452, 465 (1908), or when a new statute "can be said by fair implication or expressly to conflict with § 109," Warden, Lewisburg Penitentiary v. Marrero, 417 U.S. 653, 659 n.10 (1974).  No "magical passwords" are required.  Marcello v. Bonds, 349 U.S. 302, 310 (1955).

Certainly Congress expected the new 18:1 guidelines to go into effect within 90 days, but the guidelines have always provided only one jaw of the sentence for cocaine base; the other jaw has been mandatory minimums that override more lenient guidelines. U.S.S.G. § 5G1.1(b); e.g., United States v. Ward, 518 F.3d 75, 79 (1st Cir.), cert. denied, 129 S. Ct. 169 (2008). So it is not easy to say, as a general matter, that a lowering of the guidelines, even by Congress' direction, inherently requires or even implies that higher mandatory minimums should be abandoned.

But what is true in the general case may not be true in all cases. Here, Congress thought that the 100:1 ratio--underlying both the mandatory minimums and (until 2007) the old guidelines--was unsound and unduly harsh,[4] and it intended the common use of the 18:1 ratio in both the new guidelines and the new mandatory minimums. One can argue that Congress, having ordered the new 18:1 guidelines to apply no later than November 1, 2010, would not have wanted its end--fairer sentences--to be frustrated by requiring judges to continue applying the old 100:1 minimums ratio where the conduct predated the statute.

Even so, the statute itself adopted new mandatory minimums. Nothing would have been easier than for Congress to

---

[4]See, e.g., 156 Cong. Rec. H6198 (daily ed. July 28, 2010) (statement of Rep. James Clyburn); id. at H6202 (statement of Rep. Daniel Lungren); 155 Cong. Rec. S10492 (daily ed. Oct. 15, 2009) (statement of Sen. Jefferson Sessions); id. (statement of Sen. Patrick Leahy).

provide that the new mandatory minimums should take effect as of a specific date, such as the adoption of the FSA itself, or to provide that any sentence under the new guidelines should also be governed by the new mandatory minimums. It is therefore not difficult for the government to argue that Congress left matters to its section 109 default solution, tying penalties to the date when the conduct occurred.

As for evidence of actual intent, the FSA's legislative history indicates Congress' concern about any proposal that would require courts to resentence the vast number of prisoners in federal custody serving sentences for pre-FSA cocaine base offenses. See Restoring Fairness to Federal Sentencing: Hearing Before the Subcomm. on Crime and Drugs of the S. Comm. on the Judiciary, 111th Cong. 16-22 (2009); see also United States v. Acoff, 634 F.3d 200, 205 (2d Cir. 2011) (Lynch, J., concurring). But new sentences being imposed today for pre-FSA cocaine base offenses are a far smaller category and present no such administrative burden.

None of the Supreme Court cases squarely governs this case. Two of those cases (invoked by Douglas), United States v. Chambers, 291 U.S. 217 (1934), and Hamm v. City of Rock Hill, 379 U.S. 306 (1964), overrode section 109 in problematic situations. While the analytical explanation given in each case has little bearing on this one, the cases do suggest that some sense of the

"fair" result, arguably helpful to Douglas in light of the reformist purpose of the FSA, sometimes plays a role in applying section 109.  See Goncalves, 2011 WL 1631649, at *6-7.

Perhaps closer to this case from a factual standpoint is Marrero (relied on by the government); it held that Congress' creation of parole eligibility for serious drug offenders, overturning a prior statutory bar, would not apply retroactively to those serving sentences for crimes committed prior to the new statute.  Marrero, 417 U.S. at 663-64.  Still, the conflict between an 18:1 guidelines sentence and a 100:1 mandatory minimum may seem to some more pronounced than making the availability of parole depend on whether the prisoner committed the crime before or after an amendment allowed parole.

Further, the imposition now of a minimum sentence that Congress has already condemned as too harsh makes this an unusual case.  It seems unrealistic to suppose that Congress strongly desired to put 18:1 guidelines in effect by November 1 even for crimes committed before the FSA but balked at giving the same defendants the benefit of the newly enacted 18:1 mandatory minimums.  The purity of the mandatory minimum regime has always been tempered by charging decisions, assistance departures and other interventions: here, at least, it is likely that Congress would wish to apply the new minimums to new sentences.

-11-

Finally, while the rule of lenity does not apply where the statute is "clear," e.g., Boyle v. United States, 129 S. Ct. 2237, 2246 (2009), section 109 is less than clear in many of its interactions with other statutes, and that is arguably true in the present case as well. Our principal concern here is with the "fair" or "necessary" implication, Marrero, 417 U.S. at 659 n.10; Great N. Ny. Co., 208 U.S. at 465, derived from the mismatch between the old mandatory minimums and the new guidelines and to be drawn from the congressional purpose to ameliorate the cocaine base sentences. But the rule of lenity, applicable to penalties as well as the definition of crimes, adds a measure of further support to Douglas.[5]

Three additional matters require brief comment. First, the sentence imposed on Douglas was not only below the old mandatory minimum but also four months below the new FSA mandatory minimum. Douglas admitted to trafficking more than 50 grams of cocaine base--below the 280 grams triggering the FSA ten-year mandatory minimum but above the 28 grams prescribed by the FSA for a five-year minimum. FSA § 2(a)(2), 124 Stat. at 2372 (amending 21

---

[5]See Bifulco v. United States, 447 U.S. 381, 387 (1980) (stating that the rule of lenity applies to "interpretations of . . . the penalties" imposed by "criminal prohibitions"); cf. Friendly, Mr. Justice Frankfurter and the Reading of Statutes, in Benchmarks 196, 209 (1967) (noting an "instinctive distaste against men languishing in prison unless the lawmaker has clearly said they should"), quoted in United States v. Bass, 404 U.S. 336, 348 (1971).

U.S.C. § 841(b)(1)(B)). Douglas' guidelines range, after adjustments, was 70-87 months; but the district court departed downward to 56 months based on a government departure motion. 18 U.S.C. § 3553(e); U.S.S.G. § 5K1.1.

Absent that motion, the district court could not have gone below five years even for a defendant in Douglas' position, sentenced after November 1. While Congress meant the new guidelines to control sentencings after November 1, 2010, it cannot have intended that its new mandatory minimums be ignored, for the new mandatory minimums were adopted in the same statute as the directive that new guidelines be adopted. Neither party disputes this view. However, as the government consented to a downward departure, we have to ask ourselves--even though neither party so argues--whether that consent moots the appeal.

The sentencing transcript shows that the government reserved for appeal, with no disagreement by anyone, its position that the correct mandatory minimum remained ten years. And in the colloquy the judge made clear that his own choice of a final sentence, based on a discount from the correct guidelines sentence, was influenced by his view that the correct mandatory minimum was five years rather than ten years.[6] Because the government's appeal

---

[6]Under the guidelines, an applicable mandatory minimum raises the guidelines range, U.S.S.G. § 5G1.1(b), so the use of the ten-year minimum would have raised the starting point for the discount to 120 months, whereas the five-year minimum left the computed range at 70-87 months. See United States v. Li, 206 F.3d 78, 89

-13-

challenges the premise, the appeal is not moot.  Cf. United States v. Rodriguez, 630 F.3d 39, 43 (1st Cir. 2010); United States v. Boardman, 528 F.3d 86, 87 (1st Cir. 2008).

Second, when Douglas entered into a plea agreement and pled guilty to the charge against him, he admitted not only to the offense but also to an amount of drugs that corresponded to a minimum ten-year sentence under then-existing law.  21 U.S.C. § 841(b)(1)(A) (amended 2010).  In some such plea agreements, the government may in exchange for the plea make concessions to the defendant such as the dismissal of other pending charges, promises as to recommended sentences and the like.  To the extent that Congress thereafter reduces the penalties, the government in such a case may be deprived of the benefit of its bargain.

Of course, if Congress intended the new, lower penalties to apply, the defendant not yet sentenced is ordinarily going to be entitled to their benefit.  But it may well be arguable that--where the earlier and higher penalty was part of the bargain--the government may in certain circumstances be entitled to withdraw from the plea agreement if the bargain is now frustrated by the change in penalties.  This problem may arise in a variety of

---

(1st Cir.) ("[T]he proper starting point from which a departure is to be subtracted or to which it must be added is the greater of the guideline range or the mandatory minimum."), cert. denied, 531 U.S. 956 (2000).

-14-

situations and assuredly raises legal issues that have not been raised or briefed in this case.

The government has not suggested to us that the plea agreement itself precludes Douglas from making his present argument or that the government gave up anything in the plea agreement in reliance on the higher mandatory minimum. But the latter claim, at least, is likely to be advanced in some future cases. We take note of the problem partly to alert lawyers and judges to it but primarily to stress that nothing we have said is intended to resolve it in any of its many variants.

Third, guilty pleas aside, what this decision implies for those not yet initially sentenced is clear enough; but a set of problems remain. Some defendants were sentenced between August 3, 2010, when the FSA went into effect, and November 1, 2010, when the new 18:1 guidelines became effective. And--especially if the Commission decides to make its guidelines changes retroactive, see 28 U.S.C. § 994(u) (2006); Notice of Submission to Congress of Amendments to the Sentencing Guidelines, 76 Fed. Reg. 24,960, 24,973 (May 3, 2011)--these defendants may urge that the new guidelines and the new mandatory minimums should control.

Indeed, resentencings may occur after November 1, 2010, from a variety of causes: from appellate remands of prior sentences for errors unrelated to the FSA or from collateral attacks on sentences being served or--if the Commission makes the guidelines

changes retroactive--from district court petitions by current prisoners for discretionary resentencing, 18 U.S.C. § 3582(c)(2); U.S.S.G. § 1B1.10; cf. 18 U.S.C. § 3742(g) (governing resentencings).

Although it would be convenient if we could resolve these issues now, they are going to arise in a variety of contexts; some may pose serious difficulties; and none of these issues has been briefed in this case. Transition problems arise wherever one regime applicable to a large class supersedes another. Congress could, of course, resolve such problems through amendments to the FSA; but if it does not, the courts will have to address them through the usual processes.

Affirmed.