WILLIAMS, Circuit Judge, with whom POSNER, ROVNER, WOOD, and HAMILTON, Circuit Judges, join,
dissenting from the denial of rehearing en banc.
The sentences Congress had originally mandated for crack cocaine offenses premised on drug quantities that were one hundred times lower than those for powder cocaine offenses are indefensible. There is no debate about that. Recognizing this, Congress wiped them out in the Pair Sentencing Act of 2010 to, in its own words, “restore fairness in Federal cocaine sentencing” by eliminating the 100:1 mandatory mínimums. The only question in this case, odd as it might sound, is whether Congress wanted everyone sentenced after the Fair Sentencing Act became law to receive a “fair” sentence, or just some.
Our circuit should have heard this case en banc. Three other circuits have ruled that judges no longer must impose unfair sentences after the Fair Sentencing Act. This issue affects pending cases and many cases to come in light of the five-year statute of limitations on drug prosecutions. There were equal votes to grant and deny rehearing en banc. So our circuit’s law stands, and it is wrong.
I.
Anthony Clardy was sentenced after the Fair Sentencing Act became law. The quantity of crack cocaine involved was too small to trigger a mandatory minimum under the Fair Sentencing Act (“FSA”), and the judge imposed a sentence of 33 months’ imprisonment. The United States government, exercising the discretion to appeal sentences that it has, argued to us that Clardy should be sentenced to the higher pre-FSA mandatory minimum be *453 cause the drug deal happened before the FSA’s passage. For Clardy, that would mean a sentence of 120 months in prison. That sentence is so lengthy, and is so out of line with what the experienced sentencing judge thought the proper sentence should be, because it is premised on the 100-to-l crack to powder ratio that has been acknowledged to be baseless.
If the FSA applies to him, then, Anthony Clardy will serve a 33-month sentence. If it does not, his sentence will soar to 120 months. Perhaps this difference sounds overly dramatic, or leads one to think that the sentencing judge must have initially imposed a light sentence. That would be wrong. The United States Sentencing Guidelines advised a sentence of 30 to 37 months’ imprisonment here. The judge sentenced Clardy right in the middle.
II.
We consolidated the government’s appeal of Clardy’s sentence with its appeals in three other cases, all involving defendants who committed crimes before the FSA became law on August 3, 2010, but who were sentenced after that and under its terms. Each had an amount of crack cocaine that triggered a mandatory minimum under the old law that was less than an increased triggering amount under the FSA. In light of our ruling in United States v. Fisher, 635 F.3d 336 (7th Cir. 2011), reh’g en banc denied, 646 F.3d 429 (7th Cir.2011), a panel of our court agreed with the government, vacated the sentences imposed by the district judge, and said the pre-FSA mandatory mínimums must apply to each person. See Nos. 11-1558, et al., United States v. Holcomb, et al., Order (7th Cir. July 7, 2011).
Now the United States government has changed its position. Completely. On July 15, 2011, the United States Attorney General issued a memorandum stating he has “concluded that the law requires the application of the Act’s new mandatory minimum sentencing provisions to all sentencings that occur on or after August 3, 2010, regardless of when the offense conduct took place.” (emphasis added). The Attorney General directs prosecutors to act accordingly and concludes:
I am taking this position because it is required by the law and our mandate to do justice in every case. The goal of the Fair Sentencing Act was to rectify a discredited policy. I believe that Congress intended that its policy of restoring fairness in cocaine sentencing be implemented immediately in sentencings that take place after the bill was signed into law.
The United States government is not alone. The First Circuit ruled after us, even before the Attorney General’s memorandum, that the FSA was not limited to defendants whose conduct occurred after its passage. United States v. Douglas, 644 F.3d 39 (1st Cir.2011). So did the Eleventh Circuit. United States v. Rojas, 645 F.3d 1234 (11th Cir.2011). The Third Circuit has recently followed. United States v. Dixon, 648 F.3d 195 (3d Cir.2011). Only the Eighth Circuit has declined to apply the FSA to crack offenders sentenced after its passage. United States v. Sidney, 648 F.3d 904 (8th Cir.2011).
Attaching the Attorney General’s memorandum, the government filed a Notice of Changed Position informing us of its new position regarding these four defendants. It has done the same thing in other cases as well. Despite the government’s position that the FSA applies in sentencings after its passage including these, the law of our circuit remains the same.
There is an unfilled vacancy on our court, so we have an equal number of active judges. Half of the active judges on this court, including the two who were on the original panel in Fisher, voted to re *454 hear these consolidated cases en banc. Indeed, the changes in the landscape that have taken place after our ruling are significant. Certainly our obligation is to evaluate the merits of the statute ourselves, but the government’s “confessions of error are, of course, given great weight.” Sibron v. New York, 392 U.S. 40, 58, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968); accord Young v. United States, 315 U.S. 257, 258-59, 62 S.Ct. 510, 86 L.Ed. 832 (1942).
But half does not a majority make, and so it is not enough to obtain a rehearing en banc in our court. I believe our circuit should reexamine its position, especially in light of the events since our initial decision, and that it should do so because our position is wrong. For the reasons I explained in my dissent from the denial of rehearing en banc in Fisher, 646 F.3d 429, along with those I explain here, I dissent from the denial of rehearing en banc.
III.
The heightened mandatory mínimums for crack cocaine offenses were based on false assumptions. The Sentencing Commission knows this. See United States Sentencing Commission, Report to Congress, Cocaine and Federal Sentencing Policy (May 2002) (“The 100-to-l drug quantity was established based on a number of beliefs about the relative harmfulness of the two drugs and the relative prevalence of certain harmful conduct associated with their use and distribution that more recent research and data no longer support.”). The United States Attorney General knows this. See Statement of the Attorney General on the Passage of the Fair Sentencing Act, July 28, 2010, available at http://www.justice.gov/opa/pr/ 2010/July/10-ag-867.html (“The bill greatly reduces the unwarranted disparity in sentences for crack and powder cocaine offenses”). Congress knows this. See, e.g., 156 Cong. Reg. 1680 (Mar. 17, 2010) (statement of Sen. Durbin, FSA’s author, on day it passed the Senate) (“Every day that passes without taking action to solve the problem is another day that people are being sentenced under a law that virtually everyone agrees is unjust.... If this bill is enacted into law, it will immediately ensure that every year, thousands of people are treated more fairly in our criminal justice system.”) (emphasis added). And so Congress passed the Fair Sentencing Act of 2010, which became law when the President signed it on August 3, 2010 surrounded by bipartisan Congressional leaders and the Attorney General.
Upon that signature, I believe the Fair Sentencing Act’s lower mandatory minimums for crack cocaine offenders applied to all defendants sentenced after it. The only real argument against such a reading stems from the general saving statute, 1 U.S.C. § 109, which Congress passed after an 1871 Supreme Court decision. When the offense in the case was committed, it carried a $500 to $1000 fine or a prison term of three to five years. After the defendant’s indictment but before trial, Congress amended the penalty provision to a $300 to $1000 fine and one to five years in prison. The Supreme Court reasoned that because the penalty provisions of the two statutes conflicted, the new statute operated as a repeal of the earlier one. It held as a result that “all criminal proceedings taken under [the old statute] fell” because, it said, “[t]here can be no legal conviction, nor any valid judgment pronounced upon conviction, unless the law creating the offence be at the time in existence.” United States v. Tynen, 78 U.S. 88, 95, 11 Wall. 88, 20 L.Ed. 153 (1871). It then directed that the indictment be dismissed. Id.
Congress passed the general saving statute in response, repealing the common-law presumption. Passing the statute *455 made sense in that context. See Hamm v. City of Rock Hill, 379 U.S. 306, 314, 85 S.Ct. 384, 13 L.Ed.2d 300 (1964) (“It was meant to obviate mere technical abatement such as that illustrated by the rule in Tynen.”). In relevant part, the saving statute provides:
The repeal of any statute shall not have the effect to release or extinguish any penalty, forfeiture, or liability incurred under such statute, unless the repealing Act shall so expressly provide, and such statute shall be treated as still remaining in force for the purpose of sustaining any proper action or prosecution for the enforcement of such penalty, forfeiture, or liability. 1 U.S.C. § 109.
The saving statute, then, ensures that preexisting penalties continue, unless Congress later directs otherwise.
Before its change of position, the government used to point us to a Supreme Court saving clause case, Warden, Lewis-burg Penitentiary v. Marrero, 417 U.S. 653, 94 S.Ct. 2532, 41 L.Ed.2d 383 (1974). There, the Court ruled against a prisoner long-ago sentenced who sought to benefit from a new statute making persons convicted of his offense parole eligible, which was not true at the time he had been sentenced. That case contains the language, “the saving clause has been held to bar applications of ameliorative criminal sentencing laws repealing harsher ones in force at the time of the criminal offense.” Id. at 664, 94 S.Ct. 2532 (citing cases from D.C., Second, and Fourth Circuits). That statement is true as far as it goes — a description of what three circuit court cases it cited for that proposition had done. And it accurately describes what the saving clause can do — it can bar the application of a later more lenient sentencing law when the offense happened before its passage.
But Marrero did nothing to change what the Supreme Court made clear over one hundred years ago: the saving statute does not bar a later law’s lower penalties from immediately taking effect if Congress wants them to. The Supreme Court explained that because the saving statute “only has the force of a statute, its provisions cannot justify a disregard of the will of Congress as manifested either expressly or by necessary implication in a subsequent enaction.” Great Northern Ry. Co. v. United States, 208 U.S. 452, 465, 28 S.Ct. 313, 52 L.Ed. 567 (1908) (emphasis added); see also id. at 466, 28 S.Ct. 313 (analyzing whether statute “expressly or by fair implication” conflicted with general rule in saving statute). Marrero explicitly reaffirmed that principle. It stated that “only if [the statute at issue there] can be said by fair implication or expressly to conflict with § 109 would there be reason to hold that [the statute at issue] superseded § 109.” 417 U.S. at 659 n. 10, 94 S.Ct. 2532 (emphasis added). The Supreme Court in Marrero did not find in the new law a fair implication that Congress wanted someone like Marrero to be parole eligible; indeed, the statute there had a saving clause of its own. The relevant point from Marrero for our case is that it reaffirmed Great Northern. And that remains the law. See Douglas, 644 F.3d at 43; see also Marcello v. Bonds, 349 U.S. 302, 310, 75 S.Ct. 757, 99 L.Ed. 1107 (1955).
So Congress did not need to say in the Fair Sentencing Act, “this Act applies to any person sentenced hereafter for crack cocaine offenses, even if the conduct giving rise to conviction took place before this Act’s passage,” for it to apply in all sentencings thereafter. That would be one way to do it. But the Supreme Court does not require it. The other way, which has the exact same effect, is for Congress to manifest by “fair implication” its will to extinguish the higher mandatory minimums for crack cocaine offenses for all *456 defendants sentenced after the Act’s passage.
That is the implication of the Fair Sentencing Act.
IV.
Only one reasonable implication can be drawn from section 8 of the Act, which provides:
SEC. 8. EMERGENCY AUTHORITY FOR UNITED STATES SENTENCING COMMISSION.
The United States Sentencing Commission shall—
(1) promulgate the guidelines, policy statements, or amendments provided for in this Act as soon as practicable, and in any event not later than 90 days after the date of enactment of this Act, in accordance with the procedure set forth in section 21(a) of the Sentencing Act of 1987 (28 U.S.C. 994 note), as though the authority under that Act had not expired; and
(2) pursuant to the emergency authority provided under paragraph (1), make such conforming amendments to the Federal sentencing guidelines as the Commission determines necessary to achieve consistency with other guideline provisions and applicable law.
Pursuant to 18 U.S.C. § 3553(a)(4)(A)(ii), sentencing judges are to employ the guidelines that are in effect on the date of sentencing. See also U.S.S.G. § lBl.ll(a). With that knowledge, and invoking “emergency” authority, Congress demanded that the lower guidelines take effect in sentencings “as soon as practicable” and within ninety days at the absolute latest. That means Congress wanted guidelines based on an 18:1 powder/crack ratio to take effect right away, even in sentencings where the offender’s conduct pre-dated the Act. (There are bound to be many such cases in light of the five-year statute of limitations for drug offenses, 18 U.S.C. § 3282, and the time it takes to investigate and prosecute such cases.) The Commission promulgated new guidelines consistent with the FSA on November 1, 2010, and these “became applicable to all defendants sentenced after that date, regardless of when they committed their crimes.” United States v. Watts, 2011 WL 1282542, at *8 (D.Mass. Apr.5, 2011).
It makes no sense for Congress to will that guidelines based on an 18:1 ratio take effect immediately in sentencings even for crimes committed before the Act if those same defendants would be subject to preFSA 100:1 mandatory minimums. Why would Congress want that? That kind of sentencing scheme makes no sense. We are required to interpret statutes in a way that does not lead to nonsensical results. United States v. Rutherford, 442 U.S. 544, 552, 99 S.Ct. 2470, 61 L.Ed.2d 68 (1979). Congress’s will must have been either that the 18:1 ratio apply to all persons sentenced after the Act, or that the 18:1 ratio apply only to persons whose conduct took place after the Act.
The language Congress chose to use supports only the former. It demanded of the Sentencing Commission, “Use the 18:1 ratio. ASAP.” That meant that for sentencing judges using the new guidelines, “Use the 18:1 ratio. ASAP.” The fair implication of these demands is that Congress meant “Use the 18:1 ratio. ASAP” in all aspects of sentencing. It’s really the only implication that makes sense.
Congress also demanded in section 8 that the Commission amend its guidelines “to achieve consistency” with “applicable law,” meaning the new statutory minimums. The directive of “consistency” further shows Congress’s will that the FSA be applied to pending cases, since the guidelines would be applied to pending *457 cases. Using a pre-FSA 100:1 minimum coupled with an 18:1 guideline to decide a sentence does not “achieve consistency.” It achieves the opposite. Cf. Abbott v. United States, — U.S.-, 131 S.Ct. 18, 28, 178 L.Ed.2d 348 (2010) (rejecting interpretation that “would result in sentencing anomalies Congress surely did not intend”).
And in section 10 of the FSA, Congress directed the Sentencing Commission to study the effects of the FSA and submit a report to Congress regarding the impact of the changes in federal sentencing law “[n]ot later than 5 years after the date of enactment of this Act.” Under our circuit’s rule, and in light of the five-year statute of limitations on drug offenses, “during the time period in which the Sentencing Commission is supposed to produce a report on the effects of the FSA, the Act will often be inapplicable.” United States v. Dixon, 648 F.3d at 202.
The context surrounding the statute’s passage is important too. Exceptions to even clear statutes are to be implied to prevent “consequences obviously at variance with the policy of the enactment as a whole.” Rutherford, 442 U.S. at 552, 99 S.Ct. 2470. The policy driving the FSA was the elimination of mandatory minimum sentences that had no basis in fact or law, were based on false assumptions, and that Congress and the Attorney General and the Sentencing Commission and the President all believed were inherently unjust. Congress stated its goal for the FSA in its Preamble: “To restore fairness to Federal cocaine sentencing.” Congress believed that passing the new mandatory mínimums helped restore that “fairness.” At a fundamental level, then, as the Attorney General asked in his memorandum, and other courts ask too, why would Congress want sentencing judges to continue to impose sentences that it had already declared to be unfair?
There is no good answer to this question.
The fair, necessary, and only implication from the FSA is that Congress expected and intended its mandatory mínimums to apply immediately.
V.
There are other arguments that could be made against this reading, but none convince me that the FSA does not apply in all sentencings after it became the law. It is true that with a line drawn at the date of effect, there will be instances where persons who pled guilty early on in their cases or who did not try to evade capture do not benefit from the new mandatory minimums, unlike others who committed a crime on the same day or even were involved in the same criminal activity. But a line must be drawn somewhere. We cannot avoid that. To draw the line at conduct, when Congress’s whole point was to get rid of unjust 100:l-based sentences, and to do so right away, would mean that “the legislative mind will be set at naught.” Great Northern Ry. Co., 208 U.S. at 465, 28 S.Ct. 313. Congress gets to draw the line, and it drew it at its passage. Cf. United States v. Acoff, 634 F.3d 200 (2d Cir.2011) (per curiam) (declining to apply the FSA to defendant who had already been sentenced but had not yet exhausted his appeals).
Some of my colleagues contend it would not be fair to give less time to the co-conspirator who insisted on a trial and who thus was sentenced after the FSA, while giving more time to the cooperator who was sentenced before that date. But this fails to take into account two important sources of flexibility that are available to the district court. First, for the cooperator sentenced before the effective date, the government could move for a sentence below the statutory minimum or (more like *458 ly) file a motion to reduce the sentence under Federal Rule of Criminal Procedure 35(b)(2). See also Fed.R.Crim.P. 35(b)(4) (“When acting under Rule 35(b), the court may reduce the sentence to a level below the minimum sentence established by statute.”). For the person sentenced after the FSA’s effective date, the district court still has the option of choosing a sentence above the guidelines range, as long as it stays below the normally very high statutory maximum, if the court thinks that a higher sentence is appropriate for the person who went to trial. In short, there is plenty of authority to fine-tune in the system, and so the unfairness to which my colleagues allude is unlikely to come about.
Nor does my position mean that any time Congress reduces a sentence for an offense that the lower penalty takes effect in all sentencings immediately. The Fair Sentencing Act is no ordinary statute. It makes no sense for Congress to make it an “emergency” to get 18:1 guideline ratios in place if it wanted 100:1 mínimums it found inherently unjust to stay. Making it an “emergency” to get 18:1 guidelines in place if the 100:1 mínimums still had effect makes even less sense because the guidelines were not the biggest emergency. District judges have been able to sentence crack cocaine offenders more comparably to powder cocaine offenders since the Supreme Court gave them the discretion to do so. See United States v. Booker, 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005); Kimbrough v. United States, 552 U.S. 85, 128 S.Ct. 558, 169 L.Ed.2d 481 (2007). Congress knew that. Anyone following this issue knows that. The advisory nature of the guidelines means that it was not the guidelines that were the biggest impediment to “restore fairness in Federal cocaine sentencing.” The 100:1 mandatory mínimums were the biggest problem because they were just that, mandatory. Even knowing that, Congress made getting more equitable guidelines into place a matter of emergency. If getting only-advisory guidelines into place was a matter of emergency, taking 100:1 mandatory mínimums off the books must have been what, a code blue?
To point to Neal v. United States, 516 U.S. 284, 116 S.Ct. 763, 133 L.Ed.2d 709 (1996), as supporting a contrary reading is to miss the point. In Neal, the Court held that the Sentencing Commission’s method of calculating LSD weight didn’t control the weight calculation for purposes of a statute setting mandatory minimum sentences. 516 U.S. at 294-95, 116 S.Ct. 763. That’s obvious. But our case is about what Congress did, not the Sentencing Commission. There was no change to a statutory mandatory minimum or maximum in Neal. See id. The only change there was made by the Sentencing Commission. See id. at 292-94, 116 S.Ct. 763. Section 8 matters because it’s what Congress said, and what Congress said shows it wanted the new sentences in effect right away.
And to emphasize the 2007 amendments to the sentencing guidelines also misses the mark. Despite the changes in offense levels that resulted from those 2007 amendments, “[tjhe amended Guidelines still produce[d] sentencing ranges keyed to the mandatory minimums in the 1986 Act.” Kimbrough, 552 U.S. at 99 n. 10, 128 S.Ct. 558. The only difference was that under the 2007 amended guidelines, “the 5- and 50-gram quantities produce[d] ‘base offense levels corresponding to guideline ranges that include[d] the statutory mandatory minimum penalties,’ ” as opposed to ranges that slightly exceeded those statutory mandatory mínimums. Id. (citing United States Sentencing Commission, Report to Congress: Cocaine and Federal Sentencing Policy 8 (May 2007)) (emphasis omitted). That the base offense level for one who distributes 1 kilogram of crack *459 cocaine remains the same after the FSA and 2010 guideline amendments is also irrelevant: that individual’s base offense level, 34, corresponds to a range that exceeds even the post-FSA ten-year mandatory minimum, and does not create an inconsistency. That the 2007 guideline amendments were not linked to a change in the statutory penalties is obvious — there were no statutory changes to the mandatory mínimums in 2007. And so, despite my colleagues’ reliance on them, the 2007 amendments did not produce the illogical disparity between the statutory mínimums and the guideline ranges that our rule in Fisher perpetuates, and do not assist us in determining whether Section 8 of the FSA, which seeks to achieve consistency, is a “fair implication” under the Savings Statute.
And, as I have already discussed, a contrary result is nonsensical. Anthony Clardy’s ease illustrates that. The Sentencing Commission acted urgently at Congress’s direction and promulgated new guidelines for crack cocaine offenses on November 1, 2010. Clardy was sentenced after that. The district court judge looked to the new guidelines recommended by the Sentencing Commission, as all agree he should do. These guidelines were “consistent” with the ratios reflected in the new mandatory mínimums as Congress had directed they be. And what did the guidelines recommend for Clardy’s involvement with 13 grams of crack cocaine? A sentence of 30 to 37 months’ imprisonment, even in light of his prior drug conviction that coupled with more than 5 grams of crack cocaine triggered a 120-month mandatory minimum under the old law. The necessary and fair implication of the Fair Sentencing Act is that Congress did not want the baseless 120-month mandatory minimum that existed before it to apply to Clardy. It wanted him sentenced more fairly.
That Clardy takes no benefit from the FSA demonstrates another reason why Congress could not have wanted our circuit’s interpretation. That reading also, as I explained in my Fisher dissent, 646 F.3d at 431-32, benefits the worst offenders, as they are the ones who stand to benefit from the new guidelines since their guidelines range would be reduced, potentially to just above the statutory minimum. But for someone like Clardy, whose drug quantity was too small to trigger any mandatory minimum sentence at all under the Fair Sentencing Act, he receives only the knowledge that the members of the Sentencing Commission think the just sentence for him is nearly four times shorter.
Finally, the government had initially cited Landgraf v. USI Film Products, 511 U.S. 244, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994) to us, and it is now the first case to which some of my colleagues point. Landgraf, of course, was a civil case. The Court held there that a petitioner could not benefit from more favorable damages provisions in the Civil Rights Act that took effect while her case was on appeal. The FSA, in contrast, is clearly not a statute that “would impair rights a party possessed when he acted, increase a party’s liability for past conduct, or impose new duties with respect to transactions already completed.” Cf Landgraf, 511 U.S. at 280, 114 S.Ct. 1483. Nor does it raise any constitutional concerns with its application, as the attempt to invoke the Civil Rights Act’s punitive damages provision, id. at 281, 114 S.Ct. 1483, or a higher penalty in a criminal case would. Landgraf also says that, “[w]hen [an] intervening statute authorizes or affects the propriety of prospective relief, application of the new provision is not retroactive.” Id. at 273, 114 S.Ct. 1483.
The necessary implication of the Fair Sentencing Act is that its mandatory mini *460 mums apply in all sentencings after its passage. Declining to read the FSA to apply to offenders like Anthony Clardy would “undercut the bill’s primary objective,” “result in sentencing anomalies Congress surely did not intend,” benefit the “worst offenders,” give “rise to ... oddities,” and “not necessarily promote more equitable outcomes.” Those are not my words. They are the words of the Supreme Court from just last year, when it rejected a reading of a mandatory minimum statute that would do all those things. See Abbott v. United States, — U.S.-, 131 S.Ct. 18, 27-28, 178 L.Ed.2d 348 (2010).
VI.
The conclusion that the Fair Sentencing Act applies in sentencings, all sentencings, after its passage is not reached just by me, or my colleagues who join me. It is the conclusion reached by the Attorney General of the United States, and it is the official position the federal government will be taking in every federal court across the country. That is significant. We also rarely see such a complete change of course from it. One of those times was last year, with respect to whether sentencing judges could consider the crack/powder disparity inherent in the career offender guideline. The government’s change of position, along with the fact that no other circuit had agreed with our holding that judges could not, led us to reflect further and helped us change our mind in United States v. Corner, 598 F.3d 411 (7th Cir. 2010) (en banc). Here too, I think the new developments are worthy of reflection, and help show why our initial interpretation was not the right one. (I’m not sure what more the Attorney General needs to say, or would say that is any different than that said here or by my dissenting colleague, to help understand the position that the FSA took effect in all sentencings upon its enactment. The Solicitor General’s brief that some of my colleagues found to be so helpful in resolving Comer made the same arguments already made by the dissenters in the denial of rehearing en banc in the case Comer overturned. See United States v. Welton, 583 F.3d 494, 500-04 (7th Cir.2009).)
And although I think the text of the statute is clear and yields only one result, to the extent it is unclear, we should keep the rule of lenity in mind too. Under it, “ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity.” Skilling v. United States, - U.S. -, 130 S.Ct. 2896, 2932, 177 L.Ed.2d 619 (2010); see also United States v. Granderson, 511 U.S. 39, 54, 114 S.Ct. 1259, 127 L.Ed.2d 611 (1994) (“In these circumstances — where text, structure, and history fail to establish that the Government’s position is unambiguously correct— we apply the rule of lenity and resolve the ambiguity in [the defendant’s] favor.”). That rule favors applying the FSA in all sentencings after its passage. See Douglas, 644 F.3d at 44. That the Attorney General, the First, Third and Eleventh Circuits, and many district court judges around the country have reached the conclusion opposite from us only supports a finding that at the least there is ambiguity in the statute, and that it is not clear the FSA should not apply to everyone sentenced after it. Indeed, the rule of lenity is “rooted in the instinctive distaste against men languishing in prison unless the lawmaker has clearly said they should.” United States v. R.L.C., 503 U.S. 291, 305, 112 S.Ct. 1329, 117 L.Ed.2d 559 (1992) (plurality opinion) (quotations omitted).
It is the instinctive distaste against men and women, but mainly African-American men like Anthony Clardy, languishing in prison for committing crimes of crack rather than powder cocaine, that led Con *461 gress to pass the Fair Sentencing Act. That Congress wanted the new “fair” sentences to apply to everyone sentenced after the Fair Sentencing Act became law, not just to some, is the necessary implication of what it did.