**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 12a0229n.06

**Nos. 10-1419, 10-1486**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**

***Feb 28, 2012***

LEONARD GREEN, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE WESTERN |
| KEVIN J. RODGERS, | ) | DISTRICT OF MICHIGAN |
| | ) | |
| Defendant-Appellant. | ) | |

Before:     BOGGS, ROGERS, and SUTTON, Circuit Judges.

BOGGS, Circuit Judge.  Kevin Rodgers, already convicted of distributing crack cocaine and nearly halfway through a four-year term of supervised release, sold at least 11.2 grams of crack cocaine to an undercover officer on Michigan's Upper Peninsula Substance Enforcement Team ("UPSET") over the course of three transactions.  After the third sale, officers arrested Rodgers in Marquette, Michigan.  Through Rodgers's girlfriend, Crystal Abbott, the police learned that Rodgers rented a room from Steven Calhoun, a friend in nearby Ishpeming.  Some officers proceeded to Calhoun's house; others went to the Marquette police station to obtain a search warrant.  Calhoun consented to a search of his entire home, except for a locked bedroom, which Rodgers occupied.  Officers eventually entered the locked room pursuant to a valid warrant and found over $12,500 in cash, including marked bills that UPSET had used to buy cocaine from Rodgers.  A federal jury found Rodgers guilty of conspiracy to distribute, and to possess with the intent to

distribute, 50 grams or more of cocaine base, and of three counts of distributing cocaine base. At no point did Rodgers move for a judgment of acquittal under Rule 29. Rodgers now appeals, making three claims: (1) the district court erred by denying his motion to suppress evidence found in the locked room in Calhoun's house; (2) the government's evidence was not sufficient to support the convictions; and (3) the Fair Sentencing Act of 2010 should apply to him retroactively. None of these claims entitles Rodgers to relief. We affirm.

I

UPSET Officer Craig Michelin arranged to purchase six grams of crack cocaine from David Lampinen in Marquette, Michigan on August 11, 2008. To prepare for the transaction, Michelin photocopied the bills he planned to use, so he would be able to identify them by their serial numbers. He also wore a voice transmitter, and arranged for a surveillance team to observe the transaction.

On August 11, Michelin and Lampinen met and drove in Michelin's car to Patrick King's residence. King, however, did not have the cocaine that Michelin arranged to purchase, so he used Michelin's cell phone to contact his source and arrange a meeting place. Michelin then drove with Lampinen and King to Founder's Landing, a park in Marquette. Rodgers met them there, approached the window next to King's seat, took the money Michelin had given King, and gave King several small bags of crack cocaine.

Nine days later, Michelin arranged another purchase. This time, he contacted King directly and arranged to buy an "eight ball," or 3.5 grams, of crack cocaine. Again, he photocopied the bills he planned to use in the transaction, wore a transmitter, and arranged for a surveillance

team. Michelin went to King's house, where he waited with King until Rodgers arrived in a car driven by Crystal Abbott. Abbott came to King's door, delivered the crack cocaine, and took Michelin's money.[1]

On November 12, 2008, Michelin arranged a third transaction with King. He was to buy eight grams of crack cocaine for $600. As before, he photocopied the bills he planned to use, wore a transmitter, and arranged for a surveillance team. This transaction, however, differed from the other two. It was a "buy-bust," meaning that, after the deal ended, the police would arrest Rodgers.

Michelin arrived at King's house in the early evening. After making sure that Michelin had enough money with him, King called Rodgers to arrange delivery of the drugs. An UPSET surveillance team saw Rodgers leave Crystal Abbott's house around 5:30 p.m. and drive toward King's house in a gold Pontiac Grand Am. Rodgers arrived around 5:35 p.m. with seven grams of crack cocaine, one gram less than Michelin arranged to buy. He gave the drugs to King and left. Michelin and King came to the understanding that they would complete the transaction once Rodgers obtained more crack cocaine, and Michelin left. Michelin then went to his car and notified the surveillance team that the transaction was successful.

UPSET officers followed Rodgers from the time he left King's house and, as soon as Michelin notified them that the transaction was a success, arrested him. In Rodgers's car, the police found $619 in cash, including the money Michelin used in the just-completed drug

---

[1] Michelin could not identify Rodgers because he stayed in the car, but a member of the surveillance team did identify Rodgers as the passenger in the car Abbott was driving.

transaction, and registration papers indicating that Rodgers lived in Ishpeming, at his friend Steven Calhoun's address. The police next went to the address in Marquette that Rodgers listed as his residence when reporting to the United States probation department for an earlier distribution-of-cocaine conviction. There, they met Crystal Abbott, who consented to a search of her apartment and told them that Rodgers kept a second residence in Ishpeming. She offered to lead officers to the Ishpeming residence because she could not remember the address. The police accepted Abbott's offer, rode with her to Calhoun's house, relayed the information they had acquired to other officers, and took her home.

After receiving this information, Michelin began to prepare a search warrant for the Ishpeming residence, and sent officers to secure the house until the warrant issued. When officers first arrived around 8:30 p.m., Calhoun was uncooperative. Ultimately, however, he consented to a search of his entire house, except for a bedroom that Rodgers occupied and had secured with a personal lock. The officers decided not to open the room until Michelin obtained a warrant, but searched the rest of the house. From the time the officers entered the residence until the search warrant ultimately issued, Calhoun sat on a couch in his living room, drinking "a six-pack and . . . a half-pint of Jim Beam." From this vantage point, he could not see the entrance to Rodgers's room.

Michelin, after working through a number of technical and logistical difficulties, obtained a search warrant for Rodgers's room in Calhoun's Ishpeming home. He executed the warrant and opened the room, using a key another officer had confiscated from Rodgers earlier. In the room, officers found a Crown Royal whisky bag containing $12,900 in cash, including four marked hundred-dollar bills that Michelin had used in the August 11 transaction.

The next day, Michelin made an entry in Michigan's Automated Incident Capture System Incident Property Report, indicating that officers found the cash at 10:00 p.m., nearly an hour before the warrant issued. He testified at the suppression hearing, however, that 10:00 p.m. was an estimate, and that no officer entered the locked room until the warrant issued. Other officers' testimony corroborated this point.

On November 25, 2008, a federal grand jury charged Rodgers, Lampinen, Abbott, and King with a series of drug-related offenses. Rodgers specifically faced charges of conspiracy to distribute, and to possess with intent to distribute, fifty or more grams of cocaine base; distribution of cocaine base on August 11, 2008 and August 20, 2008; and distribution of five or more grams of cocaine base on November 12, 2008. The government later filed a supplemental information, alleging that Rodgers had a prior felony drug conviction, and the United States probation department filed a Petition for Warrant or Summons for Offender Under Supervision in the earlier case, alleging that Rodgers had violated the terms of his supervised release.

In February 2009, Rodgers filed a motion to suppress the evidence seized from his room in Calhoun's apartment. He argued that he had a cognizable privacy interest in the Ishpeming room, and that officers violated that interest by entering the room before the search warrant was issued. After an evidentiary hearing, a magistrate judge recommended that the court deny Rodgers's motion. He found first that "the search warrant was issued prior to the execution of the search of the locked room and . . . the notation in the report was an inaccurate estimate." Accordingly, he reasoned, the officers searched the room pursuant to a valid warrant and there was no Fourth Amendment violation. The magistrate judge also noted that Rodgers violated the terms of his

supervised release by maintaining a residence in Ishpeming without telling his probation officer, and that felons on supervised release have a lesser expectation of privacy, even in a legitimate residence, than an ordinary citizen. Thus, he suggested, any expectation of privacy Rodgers had in the room was not an expectation that society was prepared to view as objectively reasonable. The district court accepted the magistrate judge's recommendation on the first ground, holding: "there was sufficient evidence in the record to support the Magistrate Judge's finding that the search warrant was valid. The valid search warrant provides a sufficient basis for denying Defendant's motion to suppress evidence."

Dissatisfied with his lawyer's performance, Rodgers moved for, and received, new counsel. His new lawyer convinced the magistrate judge to re-open the earlier suppression hearing. At this second suppression hearing, Rodgers called Calhoun's upstairs neighbor, who testified that he heard drawers open and close in Calhoun's kitchen, and heard officers move ceiling tiles, before 10:51 p.m. The neighbor could not, however, say definitively that the noise he heard came from Rodgers's room.

Again, the magistrate judge recommended that the district court deny the suppression motion. He reasoned that the neighbor's testimony did not "establish that a search of the bedroom occupied by Rodgers was conducted prior to the arrival of the search warrant," and reiterated: "[t]he testimony of the officers at the [first] hearing . . . provides ample support for the conclusion that the search of the locked bedroom did not occur until after the arrival of the search warrant." Again, the magistrate judge suggested that Rodgers did not have an objectively reasonable expectation of privacy in the room because of his lies to his probation officer and his status as a felon on supervised

release. The district court denied the motion on the first ground, rejecting the broader proposition that Rodgers had no objectively reasonable expectation of privacy in the room.

Rodgers went to trial on November 1, 2009. Michelin and a number of other UPSET officers testified to the facts surrounding the three undercover transactions, Rodgers's arrest, and the officers' discovery of $12,900 in Rodgers's Ishpeming room. King confirmed that he often used Rodgers as a supplier when dealing drugs to others, and Abbott testified that she saw Rodgers make around one hundred deliveries of crack cocaine, each involving a minimum of one-half gram, and that she would sometimes make deliveries for him, including the August 18 delivery to King for Michelin. The government also called DEA Agent Kevin Driscoll, who gave opinion testimony about how drug trafficking organizations generally operate, how much crack cocaine costs, and how drug traffickers use telephones. Specifically, Driscoll opined that the $12,900 in the Ishpeming room would have purchased around 129 grams of crack cocaine in Michigan's Upper Peninsula region.

The defense offered testimony from Rodgers, who claimed that he was not involved in selling drugs, that the Ishpeming room was not a residence, but somewhere he went when he needed to get away from Abbott, and that he did not know that there was money in the room. Rodgers also provided alibi information for the two August transactions. Rodgers's mother testified that she had given her son $4,000 to purchase a car in 2008. Finally, Staci Maki testified that she was in a romantic relationship with Rodgers in 2008, and that Abbott told her she would rather see Rodgers "put away for life" than see him with Maki.

The district court gave the jury a verdict form, specifically asking whether Rodgers "conspire[d] to distribute OR possess[ed] with intent to distribute 50 grams or more of a mixture or

substance containing a detectable amount of cocaine base (crack)?" The jury answered yes. It also found Rodgers guilty of each specific distribution offense charged, and found that he distributed five grams or more of crack cocaine. At no point did Rodgers file a motion for judgment of acquittal under Federal Rule of Criminal Procedure 29.

At sentencing, the district court determined: "clearly 200 grams or more [of crack cocaine] was involved in this conspiracy." It calculated Rodgers's guidelines range using an offense level of 36 and a criminal history category of IV. The court did, however, believe that the sentencing range was "fairly steep," and imposed the mandatory minimum sentence of twenty years of imprisonment on the conspiracy count, which represented a twenty-two month downward departure from Rodgers's guidelines range. It also imposed 180-month sentences for each possession offense, to run concurrently with each other and with the longer conspiracy sentence. Rodgers appeals.

II

A motion to suppress presents a mixed question of law and fact. We, therefore, use a mixed standard of review when considering challenges to suppression decisions, reviewing determinations of law *de novo* and findings of fact for clear error. *United States v. Richards*, 659 F.3d 527, 536 (6th Cir. 2011).

> A factual finding will only be clearly erroneous when, although there may be evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. This court accords deference to the district court's assessment of credibility inasmuch as the court was in the best position to make such a determination. The evidence must be considered in the light most favorable to the party that prevailed in the court below—in this case, the government.

*United States v. Smith*, 594 F.3d 530, 535 (6th Cir. 2010) (internal quotation marks and citations omitted).

The court below did not commit clear error when it determined that the officers entered Rogers's Ishpeming room only after Michelin obtained a valid warrant. Two UPSET officers who came to Calhoun's home around 8:30 p.m. testified that Rodgers's room remained locked until the warrant issued. Michelin testified that, while he did not see officers actually unlock the room because he was talking to Calhoun, officers began to enter only after he arrived with the search warrant. He also explained that the notation in his property report, which indicated that officers found items in Rodgers's room at 10:00 p.m., was an estimate. In response, Calhoun testified that he heard noises in the area of Rodgers's room, and that the officers mentioned finding nearly $15,000. He could not, however, remember whether these events occurred before or after Michelin arrived with the search warrant. Rodgers also offered testimony from Calhoun's upstairs neighbor, who claimed that he heard noises in Calhoun's apartment as early as 8:30 or 9:00 p.m. The neighbor, however, expressly identified the noises he heard as "kitchen drawers or cupboards" opening and closing, and a moveable ceiling tile being lifted. He could not say definitively whether the noises he heard came from Rodgers's room, from the kitchen, which was adjacent to that room, or from somewhere else in the house.

The magistrate judge considered this evidence and found that "the search warrant was issued prior to the execution of the search of the locked room and . . . the notation in the report was an inaccurate estimate." He expressly reconsidered this finding in light of Calhoun's neighbor's testimony, and reaffirmed his earlier decision, stating: "The testimony of the officers . . . provides

ample support for the conclusion that the search of the locked bedroom did not occur until after the arrival of the search warrant." The district court twice adopted this conclusion.

Whether to believe Michelin and the other two UPSET officers is a question of credibility. "The trial judge's major role is the determination of fact, and with experience in fulfilling that role comes expertise." *Anderson v. City of Bessemer City*, 470 U.S. 564, 574 (1985). An appellate court, therefore, ordinarily defers to a trial court's factual determinations. This policy of deference is particularly strong when a lower court makes a credibility finding, "for only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said." *Id.* at 575. Three officers testified that no one entered Rodgers's room before Michelin arrived with the duly executed warrant. The court below believed that testimony. We will not disturb its determination.

Rodgers urges a contrary conclusion. He claims that the district court committed clear error because "the documentary evidence demonstrated the room was searched before a warrant arrived. That documentary evidence was supported by Calhoun, who was adamant that he heard officers in that room prior to the arrival of a search warrant." Appellant's Br. at 9.

First, Rodgers's interpretation of Calhoun's testimony is questionable. Calhoun stated only that he heard rustling in the area of Rodgers's room. Contrary to Rodgers's claim, Calhoun could not say whether the noises he heard were before or after the warrant arrived. Indeed, he testified that the sounds came from the area of Rodgers's room after officers closed his daughter's room. This is consistent with Michelin's claim that, after he arrived with the warrant, officers closed a door to "damper down the sound of [Calhoun]," who had become "loud and boisterous."

- 10 -

But, factual quibbles aside, Rodgers's argument is unavailing. The district court faced two conflicting accounts. It chose to accept one, rather than the other. "Because the District Court was in the best position to judge credibility, and because that Court plausibly resolved the discrepancies in the testimony, its findings of fact should not be disturbed." *United States v. Bradshaw*, 102 F.3d 204, 210 (6th Cir. 1996). The court below did not err in denying Rodgers's motion to suppress.

III

Under Federal Rule of Criminal Procedure 29, "the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction. The court may [also] on its own consider whether the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). If a defendant fails to move for a judgment of acquittal in the district court, and the district court does not grant a judgment of acquittal *sua sponte*, our review is narrowly circumscribed. We are "limited to determining whether there was a manifest miscarriage of justice. A miscarriage of justice exists only if the record is devoid of evidence pointing to guilt." *United States v. Jordan*, 544 F.3d 656, 670 (6th Cir. 2008) (quoting *United States v. Price*, 134 F.3d 340, 350 (6th Cir. 1998)). Because Rodgers did not move for a judgment of acquittal below, he must meet this high standard to succeed on his sufficiency-of-the-evidence claim.

Rodgers fails. The record is replete with, not devoid of, evidence pointing to his guilt. Michelin and other UPSET officers identified Rodgers as the source for each of Michelin's undercover drug purchases. Officers also found the cash Michelin had used for two separate undercover transactions in Rodgers's possession. Further, King testified that Rodgers supplied him

with drugs to deal to others, and Abbott testified that she saw Rodgers make—or made for Rodgers—around one hundred deliveries of crack cocaine, each involving a minimum of one-half gram, including the August 18 delivery to King for Michelin.  Finally, Agent Driscoll opined that the $12,900 in the Ishpeming room would have purchased around 129 grams of crack cocaine in the Upper Peninsula of Michigan.  This testimony all points to the very conclusion the jury drew: that Rodgers took part in a drug trafficking enterprise, involving more than fifty grams of crack cocaine.  There was no miscarriage of justice.

In response, Rodgers argues that the evidence did not show any connection between him and a conspiracy to distribute more than fifty grams of crack cocaine.  First, he  suggests that Abbott, the only "eyewitness that [sic] links [him] to more than fifty grams of crack cocaine," Appellant's Br. at 12, is unreliable because she had a tumultuous romantic relationship with him, and said she would rather see him in prison than with another woman.  *Ibid.*  Because this court should disregard Abbott's testimony, Rodgers argues, the only evidence linking him to more than 16.5 grams of crack cocaine is Agent Collins's speculation that the amount of money found in Ishpeming would buy around 129 grams of crack.  Rodgers urges that such speculation is too tenuous to support a judgment of conviction for conspiracy to distribute fifty grams or more of crack cocaine.

This argument is unavailing.  Testimony from the UPSET officers, Abbott, and King links Rodgers to amounts of crack cocaine well in excess of fifty grams.[2]  Whether Abbott was a

---

[2] Abbott's testimony alone—that she saw Rodgers complete, or helped him complete, around one hundred transactions, involving a minimum of one-half gram of crack-cocaine—would likely suffice under the manifest-miscarriage-of-justice standard.

reliable witness in light of her relationship with Rodgers is a question of credibility. At this posture, the panel simply does not consider such issues. *See United States v. Gardner*, 488 F.3d 700, 710 (6th Cir. 2007) (holding, under more lenient standard applicable to defendants who moved for relief under Rule 29: "When deciding whether any rational trier of fact could have found the essential elements of the crime, this court does not weigh the evidence, consider the credibility of witnesses, or substitute its judgment for that of the jury."). Thus, Collins's testimony about the amount of crack cocaine the money found in Ishpeming would buy is not the only evidence supporting his conviction. The other witnesses' testimony amply shows that Rodgers conspired to distribute large amounts of crack cocaine. Rodgers's conviction, we hold, was not a manifest miscarriage of justice. We affirm.

IV

The retroactivity of legislation is a matter of statutory interpretation, which this court reviews *de novo*. *Roberts v. Hamer*, 655 F.3d 578, 582 (6th Cir. 2011); *Singleton v. Smith*, 241 F.3d 534, 538 (6th Cir. 2001). We, along with every other circuit court to address the issue, have held that the Fair Sentencing Act does not apply retroactively.[3] *United States v. Carradine*, 621 F.3d 575, 580 (6th Cir. 2010). *See also United States v. Goncalves*, 642 F.3d 245, 253 n.8 (1st Cir. 2011); *United States v. Diaz*, 627 F.3d 930, 931 (2d Cir. 2010) (per curiam); *United States v. Patillo*, 403 F. App'x 761, 767 (3d Cir. 2010); *United States v. Pearson*, 415 F. App'x 479, 479 (4th Cir. 2011)

---

[3] The Supreme Court recently granted petitions for writs of certiorari in two now-consolidated cases, presenting the question whether the Fair Sentencing Act applies to defendants who committed crimes *before* the Act's effective date, but were sentenced *after* the Act took effect. *Dorsey v. United States*, No. 11-5683 (2011); *Hill v. United States*, No. 11-5721 (2011). This scenario differs from Rodgers's, since Rodgers committed his crime *and* received his sentence *before* the Act took effect.

(per curiam); *United States v. Doggins*, 633 F.3d 379, 384 (5th Cir. 2011); *United States v. Bell*, 624 F.3d 803, 814–15 (7th Cir. 2010); *United States v. Brewer*, 624 F.3d 900, 909 n.7 (8th Cir. 2010); *United States v. Baptist*, 646 F.3d 1225, 1227–28 (9th Cir. 2011) (per curiam); *United States v. Lewis*, 625 F.3d 1224, 1228 (10th Cir. 2010); *United States v. Gomes*, 621 F.3d 1343, 1346 (11th Cir. 2010). Rodgers admits as much, but argues for a contrary conclusion to preserve the argument. Appellant's Br. at 13 n.2. We adhere to *Carradine*, and hold that Rodgers is not entitled to relief based on retroactive application of the Fair Sentencing Act. *Carradine*, 621 F.3d at 580.

V

Neither Rodgers's suppression claim, nor his sufficiency-of-the-evidence claim, nor his Fair Sentencing Act claim is tenable. We AFFIRM.