# United States Court of Appeals
## For the First Circuit

No. 10-1367

UNITED STATES OF AMERICA,

Appellee,

v.

PEDRO MICHAEL GONCALVES,
a/k/a Mike Goncalves,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

[Hon. Mary M. Lisi, U.S. District Judge]

Before

Boudin, Stahl and Howard,

Circuit Judges.

George J. West with whom George J. West & Associates was on brief for appellant.
Donald C. Lockhart, Assistant United States Attorney, with whom Peter F. Neronha, United States Attorney, and Sandra R. Hebert, Assistant United States Attorney, were on brief for appellee.

April 28, 2011

**BOUDIN**, <u>Circuit Judge</u>.  Pedro Michael Goncalves appeals from his conviction on drug and gun counts and from his sentence. The appeal presents two issues of some significance--one relating to the search of a car parked in a driveway and the other to the Fair Sentencing Act of 2010, Pub. L. No. 111-220, 124 Stat. 2372-- and a host of other claims that require little time to resolve.  We begin with a bare sketch of the background events and proceedings, reserving factual detail for the discussion of specific claims.

In February 2006, a confidential informant told Scott Sullivan--a Pawtucket Police Detective working with a joint FBI/Rhode Island state police task force--that Goncalves was selling large amounts of crack cocaine in the Providence and Pawtucket areas.  The informant reported that Goncalves used a third-floor apartment at 83-85 Pomona Avenue in Providence to store and distribute crack; kept additional crack in his bedroom at his mother's house at 406 West Avenue in Pawtucket; used a white 1998 Lincoln Continental for drug deliveries; and was armed with a semi-automatic handgun.

Sullivan conducted surveillance and record checks in March and April 2006 to verify the informant's information.  He confirmed that Goncalves regularly visited the Providence apartment; that the white Lincoln (registered to his girlfriend Julia Baptista) was regularly parked there; and that Goncalves visited his mother's Pawtucket house and used that address for his cell phone

-2-

subscription. Sullivan also discovered that Goncalves had a 2000 conviction for carrying a concealed weapon and a 2003 arrest and still-pending state charge for cocaine trafficking, and that police had found a large amount of cash in Goncalves' Pawtucket bedroom in an unrelated 2003 investigation.

In March and April 2006, Sullivan oversaw two controlled purchases by the informant of crack cocaine from Goncalves. Goncalves drove the Lincoln to the first purchase, and the second purchase occurred within walking distance of the Providence apartment. Based on his corroboration of the informant's information and evidence from the second purchase, Sullivan obtained warrants authorizing searches of the Providence apartment, the Pawtucket house, and Goncalves' person.

On May 3, 2006, Sullivan planned to make a traffic stop of Goncalves in his car after he left the Providence apartment; however, Goncalves noticed the surveillance as he drove away and, ignoring red lights and reaching speeds of 100 miles per hour, led the police on a high-speed chase through various streets and on Interstate 95. Reaching his mother's house in Pawtucket, he crashed the car in her driveway, locked the driver's door, ran, and was apprehended. On searching Goncalves, police found $1,081 in cash and two cell phones--one in the name of "Eugene Fernandes" [sic] (an associate of Goncalves)--but no car keys, drugs, or gun.

In the Lincoln, police discovered hidden in the gas tank

cap 65.43 grams of powder cocaine and hidden under the hood a loaded and cocked .45 caliber semi-automatic pistol. In Goncalves' bedroom in the Pawtucket house, police found two bags of crack cocaine, totaling 10.43 grams, and a cardboard box addressed to him containing over ninety needles and syringes. In the Providence apartment, police found in the kitchen pantry and cupboards 92.43 grams of crack cocaine, a small digital scale, chemicals, and other materials useful in making and selling crack; they found elsewhere in the apartment papers and photographs connecting Goncalves to the apartment and to Fernandez.

Goncalves was indicted on five counts: three for possession with intent to distribute, 21 U.S.C. § 841(a)(1), (b)(1)(A)-(C) (2006), relating to the crack found in the Providence apartment, the crack found in the Pawtucket house, and the powder cocaine found in the Lincoln, and two counts relating to the gun found in the Lincoln--being a felon in possession, 18 U.S.C. § 922(g) (2006), and gun possession in furtherance of a drug crime, id. § 924(c). After failing in a motion to suppress the evidence, Goncalves was tried, rapidly convicted by a jury on all five counts, and sentenced (as described below). He now appeals.

Goncalves challenges the sufficiency of the government's case on all of the charges, pointing to evidence that the Providence apartment was rented in Fernandez' name and paid for and used by Fernandez and a man named "Mike" (the latter name, however, also

used by Goncalves), and that the car belonged to Baptista.  As for the crack cocaine found in the Pawtucket house, Goncalves admitted ownership but said that it was for personal use.  These are appropriate jury arguments, but the adverse evidence is so powerful that a rational jury could reasonably and readily convict on all five counts.

The bare bones of the adverse evidence have already been set forth: the association of Goncalves with both premises where drugs and drug-related items were found, his use of the Lincoln and the presence of drugs and a weapon concealed within, and his flight from arrest.  And there was considerably more evidence filling in the chinks.[1]  Whether any single event in isolation would convict him of any one of the charges might be debated; but the ensemble of pieces fit together and the jury could rationally conclude that all of the drugs belonged to Goncalves and were part of his trade.

Nor was there any difficulty in the jury's inference that the gun under the hood belonged to Goncalves and was kept in aid of his drug dealing.  The car was used by him for drug dealing, guns are a regular accessory in drug dealing, and this one was wedged under the hood--loaded and cocked--where it could be retrieved with

---

[1]For example, the government offered evidence tying Goncalves more closely to the Providence apartment; evidence reinforcing the inference of an intent to distribute drugs in the form and quantity found in the Pawtucket house; evidence tying Goncalves more closely to the car; and evidence connecting the use of weapons to drug activity.

a single movement once the hood was popped open. See United States v. Robinson, 473 F.3d 387, 400 (1st Cir. 2007). His flight from the police and his locking the car and apparently tossing away the key supported the inference that drugs or guns--here, both--were knowingly concealed within.

This brings us to Goncalves' claim that the gun and powder cocaine obtained in the search of the Lincoln should have been suppressed. Suppression would have blocked both gun convictions and one of the drug counts, and it would have barred evidence, useful if not essential, for the other two drug counts. Sullivan's warrants covered the searches of the Providence apartment and Pawtucket house, but they did not include the vehicle. A search presumptively requires a warrant, Maryland v. Dyson, 527 U.S. 465, 466 (1999) (per curiam), but as usual there are exceptions-- actually, a great many of them. See generally 2 W. LaFave, Search and Seizure § 4.1(b), at 446-51 (4th ed. 2004).

In this case, the relevant exception is for searches of automobiles. Reaching back to Carroll v. United States, 267 U.S. 132 (1925), current law is that "a search [of a vehicle] is not unreasonable if based on facts that would justify the issuance of a warrant, even though a warrant has not actually been obtained." United States v. Ross, 456 U.S. 798, 809 (1982). The question is whether probable cause exists to believe that a vehicle contains

contraband or evidence of criminal activity. <u>California</u> v. <u>Acevedo</u>, 500 U.S. 565, 579 (1991); <u>see also</u> <u>Gant</u>, 129 S. Ct. at 1721.

The district court held that there was probable cause to believe that evidence of drug dealing would be found in the car, which the police knew was regularly used by Goncalves and had in fact been used for a prior drug delivery to the informant superintended by the authorities. Further, Sullivan had been told by the previously reliable informant that Goncalves was selling crack in Providence and Pawtucket, possessed a handgun, and used the Lincoln to make drug deliveries. The high-speed chase lent additional support but none is needed.

Goncalves argues that even if the car's interior were searchable, no probable cause justified searching the engine compartment and gas cap, where the handgun and cocaine were found. But "[i]f probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of <u>every part of the vehicle and its contents</u> that may conceal the object of the search." <u>Wyoming</u> v. <u>Houghton</u>, 526 U.S. 295, 301 (1999) (quoting <u>Ross</u>, 456 U.S. at 825, and adding emphasis). Sullivan testified as to the use of such hiding places by drug dealers, and common sense would suggest this possibility anyway.

On appeal, Goncalves for the first time makes new arguments for suppression not presented at the district court suppression hearing. These are forfeited, of course, Fed. R. Crim.

P. 12(b)(3), (e); United States v. Torres, 162 F.3d 6, 11 (1st Cir. 1998), cert. denied, 526 U.S. 1057 (1999), but the forfeiture may be forgiven where plain error exists under United States v. Olano, 507 U.S. 725, 731-32 (1993). See United States v. St. Pierre, 488 F.3d 76, 80 n.2 (1st Cir. 2007).

One new argument is that the police created a dangerous situation by allowing Goncalves to drive off in the Lincoln (and so to flee at high speed when he sought to evade the police) and that therefore the fruits of this tactic should be banned on public policy grounds. Sullivan explained that, knowing from the informant that Goncalves might be armed, the police thought it safer to block him in his car than to enter the Providence apartment with Goncalves inside. Anyhow, courts are not in the business of suppressing evidence on generalized public policy grounds not required by the Fourth Amendment.[2]

Goncalves' final new argument is the most serious one: he argues that the automobile exception does not apply to a vehicle parked in a private driveway and unoccupied by anyone who might drive it away. This is a significant unresolved issue, primarily because, forty years ago, the Supreme Court held that the automobile exception did not justify the warrantless search of the defendant's

_____

[2]Goncalves makes a related argument that the planned traffic stop was a pretext to allow them to search his car without a warrant, but--aside from several other answers--subjective intent is irrelevant in this context, Whren v. United States, 517 U.S. 806, 813 (1996).

-8-

car parked in his own driveway. Coolidge v. New Hampshire, 403 U.S. 443, 459-62 (1971).

Just what to make of Coolidge's reach today is debatable. The Court was fractured so there was no majority position on the driveway search issue, questions other than the Carroll doctrine received primary attention, and--most important--the plurality opinion's disallowance of the driveway search was highly fact-specific, stressing circumstances that would easily distinguish our case. For example, the Court stated:

> In this case, the police had known for some time of the probable role of the Pontiac car in the crime. Coolidge was aware that he was a suspect in the Mason murder, but he had been extremely cooperative throughout the investigation, and there was no indication that he meant to flee. He had already had ample opportunity to destroy any evidence he thought incriminating. There is no suggestion that, on the night in question, the car was being used for any illegal purpose, and it was regularly parked in the driveway of his house. The opportunity for search was thus hardly "fleeting." The objects that the police are assumed to have had probable cause to search for in the car were neither stolen nor contraband nor dangerous.

Coolidge, 403 U.S. at 460 (emphasis added).

The contrast is striking between the case before us and the underlined points stressed in Coolidge: Goncalves was far from cooperative, he did seek to flee, he had not had a chance to destroy or to remove the gun or drugs, his car was being used for the

-9-

illegal purpose of transporting drugs and a concealed weapon, and the items being sought were both contraband and dangerous.

Further, after Coolidge, the Court has distinguished between buildings and cars, emphasizing the "significantly" lesser "expectation of privacy" in the latter, South Dakota v. Opperman, 428 U.S. 364, 367 (1976), based on "the pervasive regulation of vehicles capable of traveling on the public highways," California v. Carney, 471 U.S. 386, 392 (1985). In various contexts, the Court has been lenient in upholding searches under the automobile exception. E.g., Pennsylvania v. Labron, 518 U.S. 938, 940 (1996) (per curiam); Cardwell v. Lewis, 417 U.S. 583, 590 (1974) (plurality opinion); Cady v. Dombrowski, 413 U.S. 433, 446 (1973).

Finally, a number of circuits have upheld driveway searches with probable cause but no warrant: three have squarely applied the automobile exception to permit searches of vehicles parked in the driveway of the defendant's own residence,[3] while others including this one have permitted such searches of vehicles in private driveways that were not the defendant's residence.[4] A

---

[3]United States v. Blaylock, 535 F.3d 922, 925-27 (8th Cir. 2008), cert. denied, 130 S. Ct. 58 (2009); United States v. Hines, 449 F.3d 808, 810-15 (7th Cir. 2006); United States v. Hatley, 15 F.3d 856, 858-59 (9th Cir. 1994).

[4]United States v. DeJear, 552 F.3d 1196, 1202 (10th Cir.), cert. denied, 129 S. Ct. 2418 (2009); United States v. Brookins, 345 F.3d 231, 234-38 (4th Cir. 2003); United States v. Markham, 844 F.2d 366, 367-69 (6th Cir.), cert. denied, 488 U.S. 843 (1988); United States v. Moscatiello, 771 F.2d 589, 599-600 (1st Cir. 1985), vacated on other grounds by Murray v. United States, 487

few others have expressed doubts in light of Coolidge, e.g., United States v. Fields, 456 F.3d 519, 524-25 (5th Cir.), cert. denied, 549 U.S. 1046 (2006), but no circuit appears to read Coolidge as a per se rule against all driveway searches without a warrant.

Here, it would be enough for us to uphold the search under the automobile exception on the grounds that Goncalves had tried to flee with a car known to be used for carrying drugs, had been chased into a driveway, and then had fled so that probable cause certainly existed to believe that the car contained contraband and quite possibly a weapon. Even if this were a close call, we are dealing with an unpreserved claim of error. There is certainly no "plain" error--let alone anything remotely approaching the miscarriage of justice required under the Olano standard.

The remaining issues on appeal concern Goncalves' sentence. At sentencing, the district court imposed concurrent twenty-year sentences on each of the three drug counts, 21 U.S.C. § 841(a)(1), (b)(1)(A)-(C), a concurrent ten-year sentence on the firearm felon-in-possession count, 18 U.S.C. § 922(g), and a consecutive five-year sentence on the count charging gun possession in furtherance of a drug crime, id. § 924(c). Thus, his current term of imprisonment is twenty-five years.

Our concern is with the count I sentence of twenty years imposed for the 92.43 grams of crack stored in the Providence

_____

U.S. 533 (1988).

-11-

apartment. At the time Goncalves committed the crime, the governing federal statute, 21 U.S.C. § 841(b)(1)(A)(iii), imposed a mandatory ten-year minimum term for offenses involving over fifty grams of cocaine base (a term that encompasses crack cocaine); but the mandatory minimum increased to twenty years because Goncalves had a prior felony drug conviction, id., and the government filed the necessary information, id. § 851.

Goncalves was sentenced on March 19, 2010. On August 3, 2010, the President signed the Fair Sentencing Act of 2010 (the "Act" or "FSA"), which reduced the mandatory minimums for specified drug crimes. Under the Act, the current mandatory minimum for 92.43 grams of crack with a prior drug felony would be only ten years; on the other two drug counts, no mandatory minimum would apply to Goncalves' violations. If the FSA governed here, Goncalves could conceivably get a substantial reduction in sentence on remand.

The difficulty for Goncalves lies with the general federal savings statute, which in pertinent part provides:

> The repeal of any statute shall not have the effect to release or extinguish any penalty, forfeiture, or liability incurred under such statute, unless the repealing Act shall so expressly provide, and such statute shall be treated as still remaining in force for the purpose of sustaining any proper action or prosecution for the enforcement of such penalty, forfeiture, or liability.

-12-

1 U.S.C. § 109 (2006).  Section 109 not only includes but was primarily enacted to cover criminal cases and to undo the common-law rule abating prosecution upon the repeal of the statute.

"Incurred" means "to which one is subject"--not "already imposed"--and so looks to the time of the conduct that makes the defendant liable rather than the date of conviction or imposition of sentence.  United States v. Reisinger, 128 U.S. 398, 401 (1888) ("[The savings statute] clearly excepts offences committed before the passage of the repealing act . . . .").  Thus, if a new criminal statute supersedes an older one, conduct occurring under the superseded version can still be punished under the older version. This dovetails with ex post facto principles that allow the new statute to apply only to post-enactment conduct.

Congress can decide to narrow a statute so as to de-criminalize pre-enactment conduct or to lessen the penalty for illegal conduct occurring before the more lenient penalty was enacted.  But, by the terms of the savings statute, the narrowed definition of the crime or the reduced penalty provided in the new statute benefits the defendant only where "the repealing Act shall so expressly provide," either in terms or by necessary implication. Goncalves can point to no express provisions in the FSA that even arguably satisfy that test as to him.[5]

_____

[5]At least one district court has held that provisions of the FSA, coupled with later amendments by the Sentencing Commission, do make the FSA's adjustments--including a lessening of mandatory

Goncalves argues that Congress' intent in the FSA is unclear because the Act itself says nothing about the retroactivity issue, but this argument misses the point. The savings statute adopts a general rule that the penalty incurred is that provided by the statute in effect at the time of the conduct unless the superseding statute provides otherwise. Section 109 is not a presumption or indicator of subjective intent: it is a binding rule that overturns common-law abatement and governs the meaning that courts are to give to the superseding statute unless otherwise affirmatively directed.

The motivation for the FSA was to reduce the harshness of existing drug sentences, centrally by modifying the underlying ratio that punished quantities of cocaine base much more heavily than equivalent weights of powder cocaine. The legislative history of the FSA suggests that some who voted may have believed that the old 100:1 ratio was unconstitutional under the equal protection clause;[6]

---

minimums--applicable to defendants sentenced after the amendments became effective. United States v. Douglas, 746 F. Supp. 2d 220 (D. Me. 2010) (now pending in this circuit). Nothing in this decision is intended to resolve the distinct issues in that appeal.

[6]See 156 Cong. Rec. H6198 (daily ed. July 28, 2010) (statement of Rep. James Clyburn) ("[T]his is unjust and runs contrary to our fundamental principles of equal protection under the law."); 155 Cong. Rec. S10492 (daily ed. Oct. 15, 2009) (statement of Sen. Patrick Leahy) ("Today, the criminal justice system has unfair and biased cocaine penalties that undermine the Constitution's promise of equal treatment for all Americans."); id. at S10491 (statement of Sen. Richard Durbin) ("There is widespread and growing agreement that the Federal cocaine and sentencing policy in the United States today is unjustified and unjust.").

and, were that true, the old ratio certainly could not be applied to persons who were convicted under prior law, at least if they were still to be sentenced or on direct appeal after sentencing.

But professions of individual legislators do not establish the view of Congress, see Garcia v. United States, 469 U.S. 70, 76 (1984); still less do individual statements made after the legislation has been adopted. Probably the fairest assessment is that Congress as a whole viewed the 100:1 ratio as too harsh and adopted a compromise reducing the ratio to 18:1 (rather than 1:1) because many members thought that crack remains more dangerous than powder cocaine.[7] The Supreme Court has never suggested that the 100:1 ratio violates the Constitution.

There is assuredly a policy reason favoring Goncalves' requested result: Congress did think that the superseded law was too harsh, so that it will be too harsh for Goncalves just as much as for those who committed the same offense after the FSA went into effect. Indeed, Goncalves suggests that the discrepancy is itself unconstitutional under equal protection principles; but discrepancies among persons who committed similar crimes are

---

[7]The initial bill proposed a 1:1 crack/powder sentencing ratio, 155 Cong. Rec. S10490 (daily ed. Oct. 15, 2009) (statement of Sen. Richard Durbin). The Senate Judiciary Committee amended the bill to the 18:1 ratio as a "bipartisan compromise." 156 Cong. Rec. S1681 (daily ed. Mar. 17, 2010) (statement of Sen. Richard Durbin).

-15-

inescapable whenever Congress raises or lowers the penalties for an offense. Most often, the dividing line is the date of the crime.

As for precedent, ten other circuits have considered this question and held that the FSA is not retroactive to persons in Goncalves' position.[8] The Supreme Court has not addressed the issue under the FSA, but Warden, Lewisburg Penitentiary v. Marrero, 417 U.S. 653 (1974), is somewhat apropos and supports the government. There, the Court applied the savings statute to reject a claim that a statute that loosened parole eligibility should apply to those who committed their crimes before the statute was enacted. Id. at 659-64.

Goncalves relies primarily on several Supreme Court decisions. The earliest, United States v. Chambers, 291 U.S. 217, (1934), held that the savings statute did not rescue a prosecution for liquor law violations carried on after the Twenty-first

---

[8]See United States v. Glover, 398 F. App'x 677, 680 (2d Cir. 2010), cert. denied, 131 S. Ct. 1582 (2011); United States v. Reevey, 631 F.3d 110, 113-15 (3d Cir. 2010); United States v. McAllister, 401 F. App'x 818, 820 n.* (4th Cir. 2010) (per curiam); United States v. Doggins, 633 F.3d 379, 384 (5th Cir. 2011); United States v. Carradine, 621 F.3d 575, 580 (6th Cir. 2010), cert. denied, 79 U.S.L.W. 3539 (U.S. Mar. 21, 2011) (No. 10-8937); United States v. Bell, 624 F.3d 803, 814-15 (7th Cir. 2010), cert. denied, 79 U.S.L.W. 3592 (U.S. Apr. 18, 2011) (No. 10-9409); United States v. Brewer, 624 F.3d 900, 909 n.7 (8th Cir. 2010), cert. denied, 79 U.S.L.W. 3553 (U.S. Mar. 28, 2011) (No. 10-9224); United States v. Hall, 403 F. App'x 214, 217 (9th Cir. 2010); United States v. Lewis, 625 F.3d 1224, 1228 (10th Cir. 2010), cert. denied, 79 U.S.L.W. 3553 (U.S. Mar. 28, 2011) (No. 10-8606); United States v. Gomes, 621 F.3d 1343, 1346 (11th Cir. 2010) (per curiam), cert. denied, 79 U.S.L.W. 3568 (U.S. Apr. 4, 2011) (No. 10-9271).

Amendment repealed the Eighteenth Amendment. Id. at 224-26. The Court treated the liquor law in question as resting on the Eighteenth Amendment and said that the savings clause itself rested implicitly on the premise of a continuing power to punish the conduct after a statute was repealed. Id. at 224. Because that power lapsed on repeal of the Eighteenth Amendment, the prosecution had to be terminated.

This style of syllogistic reasoning might or might not find favor with the present Court; possibly the Chambers decision, about five pages in length and unanimous, owed something to the distaste for the failed experiment with a national liquor ban. But assuming that Chambers remains good law, it offers no support to Goncalves. Congress retains full constitutional power after the FSA both to criminalize the underlying conduct and to punish it at the same level as existed prior to the reduction.

Goncalves' other decision, Hamm v. City of Rock Hill, 379 U.S. 306 (1964), invoked the federal Civil Rights Act of 1964 to overturn state court decisions upholding the convictions of "sit-in" demonstrators protesting racial segregation in retail store lunchrooms--demonstrations occurring prior to the federal statute. Id. at 312-17. The 1964 statute was read by the Court to give the defendants a right to use the facilities without discrimination, and the Court noted that the statute explicitly forbade anyone to

"punish or attempt to punish" the exercise of that right. Id. at 311.

Hamm held that the savings clause had no application because Congress had "substitute[d] a right for a crime." Id. at 315. The result, which (as with Chambers) likely owed something to the social context, might have been more easily reached by saying that the savings clause by its terms did not apply because Congress was not engaged in "the repeal of any statute," let alone a federal statute. In all events, nothing in the FSA gave Goncalves "the right" to sell drugs or to carry arms in aid of that enterprise, and Hamm too is easily distinguishable.

In legal terms, the FSA is clearly inapplicable to this case; in human terms, the result is much less attractive but that is because the savings statute treats all such penalty reductions generically, and Congress did not expressly make the FSA an exception here. It could easily have done so; indeed, it remains free to do so now. More broadly, it could sensibly amend section 109 so that reductions in penalties for a pre-existing crime presumptively applied upon the enactment (or effective date) of the statute to anyone not yet sentenced or otherwise still on direct appeal.

Goncalves raised two other sentencing challenges in his brief. The first--a challenge to imposing the consecutive running of 18 U.S.C. § 924(c)(1)(A)'s mandatory minimum--his reply brief

acknowledges is now foreclosed by <u>Abbott</u> v. <u>United States</u>, 131 S. Ct. 18 (2010). The second challenge--an argument that the application of a sentencing enhancement under 21 U.S.C. § 851 requires proof to a jury--is foreclosed by <u>Almendarez-Torres</u> v. <u>United States</u>, 523 U.S. 224 (1998), <u>Harris</u> v. <u>United States</u>, 536 U.S. 545 (2002), and a number of this circuit's precedents upholding the constitutionality of section 851 enhancements, <u>e.g.</u>, <u>United States</u> v. <u>Marsh</u>, 561 F.3d 81, 85 (1st Cir.), <u>cert. denied</u>, 129 S. Ct. 2784 (2009).

A final sentencing issue is raised by an error called to our attention not by Goncalves but by the government. It appears that the district court, in imposing twenty-year sentences on the drug count under 21 U.S.C. § 841(b)(1)(A) for the crack found in the Providence apartment and on the <u>other</u> two drug counts, assumed wrongly that the other two also required twenty-year mandatory sentences, as the first one did. Apparently, no one noticed the discrepancy at the time and called it to the court's attention.

The government points out that one of the two counts in question, 21 U.S.C. § 841(b)(1)(B), had only a ten-year mandatory minimum sentence, and the other, <u>id.</u> § 841(b)(1)(C), had no mandatory sentence at all. The government has invited the defendant to ask for a remand for resentencing, and defendant in his reply brief so requests. This court, as well as Goncalves, is indebted to government counsel for his care and his candor.

The judgment of conviction is _affirmed_, as is the twenty-year mandatory minimum sentence for the drugs at the Providence apartment, the concurrent ten-year sentence on the firearm felon in possession count, and the consecutive five-year sentence for gun possession in furtherance of a drug crime. The sentences for the other two drug counts are _vacated_ and the case is _remanded_ for resentencing on those counts.

_It is so ordered_.