# United States Court of Appeals
## For the First Circuit

No. 10-1687

UNITED STATES OF AMERICA,

Appellee,

v.

JUAN SANTOS-RIVERA,

Defendant-Appellant.

No. 10-1931

UNITED STATES OF AMERICA,

Appellee,

v.

JEFFREY CARRASQUILLO-OCASIO,

Defendant-Appellant.

No. 10-2155

UNITED STATES OF AMERICA,

Appellee,

v.

JESÚS M. DÍAZ-CORREA,

Defendant-Appellant.

APPEALS FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. Gustavo A. Gelpí, <u>U.S. District  Judge</u>]

———————————

Before

Torruella, Lipez, and Howard, <u>Circuit Judges.</u>

———————————

<u>David Ramos-Pagan</u> for appellant Juan Santos-Rivera.
<u>Alan Jay Black</u> for appellant Jeffrey Carrasquillo-Ocasio.
<u>Juan M. Masini-Soler</u> for appellant Jesús M. Díaz-Correa.
<u>Mariana Bauzá</u>, Assistant United States Attorney, with whom <u>Rosa Emilia Rodríguez-Vélez</u>, United States Attorney, <u>Nelson Pérez-Sosa</u>, Assistant United States Attorney, and <u>Julia M. Meconiates</u>, Assistant United States Attorney, were on brief, for appellee.

———————————

August 7, 2013

———————————

**LIPEZ, <u>Circuit Judge</u>.** Following a sixteen-day trial, a jury convicted the defendants on conspiracy and drug possession charges stemming from their role in a criminal organization operating a 24-hour "drug point" in the Jesus T. Piñero Public Housing Project in Canóvanas, Puerto Rico. Each of the three defendants was convicted of conspiracy to possess with the intent to distribute at least 50 grams of cocaine base, at least 5 kilograms of cocaine, and a measurable quantity of marijuana within 1,000 feet of a protected zone and of aiding and abetting the same in violation of 21 U.S.C. §§ 841(a)(1),(b)(1)(A)(iii), 846, and 860, and 18 U.S.C § 2. Defendant Jesús Díaz-Correa was also convicted of conspiracy to possess firearms in furtherance of drug trafficking crimes in violation of 18 U.S.C. § 924(o). Each defendant received a lengthy term of incarceration: Díaz-Correa was sentenced to 330 months, Juan Santos-Rivera to 240 months, and Jeffery Carrasquillo-Ocasio to 216 months. The jury also imposed a forfeiture under 21 U.S.C. § 853.

Defendants Díaz-Correa and Carrasquillo-Ocasio challenge their convictions, asserting that the district court erred in denying their motions under Federal Rule of Criminal Procedure 29 for a judgment of acquittal. Díaz-Correa also argues in the alternative that his conviction was irreparably tainted by prosecutorial misconduct during closing arguments. Carrasquillo-Ocasio and Santos-Rivera both challenge their sentences.

Although there was an instance of prosecutorial misconduct here, it is saved by harmless error. Hence, we affirm the judgments of the district court.

## I. Background

"We turn to the trial record for the following background, presenting the facts in the light most favorable to the verdict." United States v. Gómez-Rosario, 418 F.3d 90, 93 (1st Cir. 2005).

The three defendants in this case were indicted, along with 39 co-conspirators, for their role in a substantial, organized drug trafficking conspiracy operating out of the Jesús T. Piñero Public Housing Project ("Piñero") in Canóvanas, Puerto Rico from 2006 to 2008. According to the testimony at trial, the drug point operated around the clock, moving at least 400 vials of crack cocaine, 30 bags of powder cocaine, and 160 bags of marijuana on a daily basis.

The Piñero operation was sufficiently organized so that each co-conspirator had a prescribed, specialized role within the operation. Santos-Rivera was a "pusher," meaning he sold drugs at the drug point on behalf of the organization and received a commission on those sales. Carrasquillo-Ocasio was also a "pusher" for the organization, but during the relevant period he was promoted and became a "runner" for the ten-dollar bags of cocaine. As such, he was in charge of delivering cocaine from the stash points to the sellers working the drug point, and he had to collect and tally cash at the end of shifts, distribute to the sellers

-4-

their commission, and return that money to the drug point administrators. Díaz-Correa was an "administrator" of the Piñero drug point. He was responsible for overseeing the day-to-day operations of the drug point and hosting meetings with other leaders to organize and plan the conspiracy's unlawful business.

To support the charge of a drug trafficking conspiracy, the government introduced drugs and weapons seized from Piñero, surveillance photographs and video recordings of the drug point in operation, and wire-tap recordings of conversations between various co-conspirators. To tie the three co-defendants to the conspiracy, the government relied primarily on the testimony of two confessed former co-conspirators: 1) Gretchen Villafañe, the common law wife of the organization's incarcerated former leader, and 2) Daniel Nuñez-Rivera, also known as Danny Sellés, an active member of the Piñero drug operation who became a confidential informant sometime in 2007. The jury convicted the defendants on every count charged in the indictment.

We first discuss the challenges to the convictions, beginning with Díaz-Correa and Carrasquillo-Ocasio's sufficiency challenges and then address Díaz-Correa's allegation of prosecutorial misconduct. We close with a discussion of Carrasquillo-Ocasio and Santos-Rivera's challenges to their sentencing.

## II. Challenges to the Convictions

### A. Sufficiency of the Evidence

"We review de novo the district court's denial of a motion made under Rule 29 for judgment of acquittal." United States v. Fernández-Hernández, 652 F.3d 56, 67 (1st Cir. 2011). In our review, "[w]e examine the evidence, both direct and circumstantial, in the light most favorable to the jury's verdict. We do not assess the credibility of witnesses, as that role is reserved for the jury. Nor need we be convinced that the government succeeded in eliminating every possible theory consistent with the defendant's innocence. Rather, we must decide whether that evidence, including all plausible inferences drawn therefrom, would allow a rational factfinder to conclude beyond a reasonable doubt that the defendant committed the charged crime." United States v. Troy, 583 F.3d 20, 24 (1st Cir. 2009) (citations omitted) (internal quotation marks omitted). This standard of review is formidable and "defendants challenging convictions for insufficiency of evidence face an uphill battle on appeal." United States v. Lipscomb, 539 F.3d 32, 40 (1st Cir. 2008) (citation omitted) (internal quotation marks and alterations omitted); see also United States v. Polanco, 634 F.3d 39, 44-45 (1st Cir. 2011) (noting that "a sufficiency challenge is a tough sell").

**1. Drug Trafficking Charges**

"To prove a drug conspiracy charge under 21 U.S.C. § 846, the government is obliged to show that a conspiracy existed and that a particular defendant agreed to participate in it, intending to commit the underlying substantive offense." United States v. Baltas, 236 F.3d 27, 35 (1st Cir. 2001) (citations omitted) (internal quotation marks omitted). Because neither can seriously contend that a drug conspiracy did not exist at Piñero, both defendants attack the evidence demonstrating their agreement to participate in the drug-selling operation there. Specifically, they argue that the testimony of the government's key witnesses, co-conspirators Nuñez-Rivera and Villafañe, was too conclusory and unreliable for a reasonable factfinder to conclude beyond a reasonable doubt that Díaz-Correa and Carrasquillo-Ocasio were involved in the drug trafficking conspiracy and drug distribution activities at Piñero. We discuss Díaz-Correa's sufficiency challenge before turning to Carrasquillo-Ocasio's.

**a. Díaz-Correa**

Díaz-Correa offers three interrelated arguments in support of his sufficiency challenge. First, he argues that because no physical evidence offered at trial linked him to the Piñero conspiracy, the testimony of two co-conspirators is per se insufficient to support a conviction. Second, he argues that even if a conviction could in some instances be supported by co-

conspirator testimony, Nuñez-Rivera and Villafañe's testimony was insufficient in his case to establish that he participated in the Piñero conspiracy. Finally, he argues that even if the co-conspirators' testimony taken at face value would be sufficient to support his conviction, their testimony was not credible.

Díaz-Correa's argument that the testimony of co-conspirators, standing alone, is never sufficient to support a conviction is foreclosed by our case law. We have previously upheld drug conspiracy and aiding and abetting convictions where the evidence tying the defendant to the conspiracy was provided primarily by the testimony of a single co-conspirator who became a paid government informant. See United States v. González-Vázquez, 219 F.3d 37, 40-41, 45-46 (1st Cir. 2000); see also United States v. Fernández-Hernández, 652 F.3d 56, 67-68 (1st Cir. 2011). Indeed, we have consistently reaffirmed that "[a] conviction may be based solely on the uncorroborated testimony of a confidential informant 'so long as the testimony is not incredible or insubstantial on its face.'" González-Vázquez, 219 F.3d at 46 (quoting United States v. Ciocca, 106 F.3d 1079, 1084 (1st Cir. 1997)).

Díaz-Correa's second argument -- that Villafañe and Nuñez-Rivera's testimony amounts to vague generalizations -- is equally unavailing. During their testimony, both Nuñez-Rivera and Villafañe demonstrated a detailed knowledge of the Piñero drug conspiracy. For example, when shown photographs of several co-

conspirators, Nuñez-Rivera knew their names, their roles in the conspiracy, where they worked, and what drugs they supplied. He testified as to the shift schedule for pushers working at the drug point and the general flow of operations at Piñero, including which times of day, days of the week, and days of the month were usually busy and which ones were slow. For her part, Villafañe testified as to how she would hide weapons and drugs for the conspiracy in her home. She also described meetings she attended with the organization's leaders and could identify which co-conspirators were in charge of the money, of cooking the crack cocaine, and of packaging and weighing the drugs.

The testimony of the two witnesses as to Díaz-Correa's specific role in the conspiracy was likewise more than sufficiently detailed to sustain his conviction. In particular, both Nuñez-Rivera and Villafañe described Díaz-Correa's rise to power in 2008. Ismael Heredia, the organization's incarcerated leader, became dissatisfied with his former drug point administrator and determined to replace him with Díaz-Correa. Nuñez-Rivera testified that Díaz-Correa frequently came to Piñero in person to administer his drug point, and that once he had established himself as the administrator of the Piñero drug point, he began to operate the drug point in a similar manner to his predecessor, including hosting organizational meetings at a place called "La Selva." This testimony was also confirmed in part by recorded conversations

between Villafañe and Heredia, during which they discussed Díaz-Correa.

Credibility is a question for the jury, which on appeal must be resolved in favor of the government. See United States v. Ayala-García, 574 F.3d 5, 12 (1st Cir. 2009). Although Díaz-Correa attempts to save his argument for evidentiary insufficiency by pointing to a few minor inconsistencies between Nuñez-Rivera and Villafañe's testimony, such minor inconsistencies in otherwise lengthy and corroborated testimony will not undermine the witness' credibility. See United States v. Rodriguez, 457 F.3d 109, 119 (1st Cir. 2006).

### b. Carrasquillo-Ocasio

In an echo of Díaz-Correa's argument, Carrasquillo-Ocasio asserts that Nuñez-Rivera's testimony against him amounted to nothing more than vague generalizations. But, again, the record reveals that Nuñez-Rivera gave detailed testimony based on his personal experiences selling drugs with Carrasquillo-Ocasio. Nuñez-Rivera could recall the specific timing of the shifts he worked with Carrasquillo-Ocasio and what drugs they sold. When shown a map of the Piñero complex, Nuñez-Rivera pointed out the exact locations where he and Carrasquillo-Ocasio sold drugs together. Nuñez-Rivera recalled Carrasquillo-Ocasio's promotion to a "runner," and he described the process Carrasquillo-Ocasio would use when delivering the cocaine to the drug point and when

collecting the cash revenues at the end of the shifts and delivering them to the organization's leaders.  This testimony was consistent with Villafañe's testimony that she personally delivered cash to Carrasquillo-Ocasio which he in turn delivered to the drug point's leaders.

In short, Nuñez-Rivera and Villafañe's testimony was not "incredible or insubstantial on its face," Ciocca, 106 F.3d at 1084, and was more than enough  to enable a reasonable factfinder to determine Carrasquillo-Ocasio's guilt beyond a reasonable doubt.

### 2. Díaz-Correa's Conviction under Section 924(o)

Díaz-Correa's argument that there was insufficient evidence to convict him under 18 U.S.C. § 924(o) is similarly unpersuasive. Where a defendant is charged under 18 U.S.C. § 924(o) "the jury [does] not even need to find that [the defendant] himself ever used or possessed a firearm in furtherance of the drug conspiracy.  It would be sufficient to find that he was part of an agreement to do so." United States v. Flores de Jesús, 569 F.3d 8, 30 n.14 (1st Cir. 2009).  As previously discussed, there was more than sufficient evidence in this case that Díaz-Correa was a leader of the drug conspiracy at Piñero.  Thus, to sustain a conviction under section 924(o), the government need only show that Díaz-Correa was part of an agreement to use firearms in furtherance of the Piñero organization's interests.

At trial, the government offered testimony and real evidence

-11-

demonstrating that firearms were used regularly in furtherance of the Piñero drug conspiracy. Firearms and ammunition which had been seized from members of the Piñero drug trafficking operation were entered into evidence, including a Romarm/Cugir Rifle, a Sig Sauer pistol, a Colt revolver, a Glock pistol, and a Smith & Wesson .38 caliber revolver. Many of these weapons were seized from sellers operating at Piñero during a single raid.

Villafañe's and Nuñez-Rivera's testimony also established that guns were a regular part of the operation of the Piñero drug conspiracy. For example, Villafañe testified that she stored guns on behalf of the organization and she testified that certain co-conspirators always carried guns while at Piñero.

Nuñez-Rivera also testified that he had seen Díaz-Correa himself carry guns while administering the drug point. According to Nuñez-Rivera, when Díaz-Correa was promoted to administrator at the drug point:

> **A:** [Manuel][1] let us know that the housing project no longer was Ismael's, that it was his. And he was – he wanted no fucking around with his stuff.
> **Q:** Sir, was Manuel armed that day?
> **A:** Yes
> ....
> **Q:** Did Manuel carry firearms aside from that day?
> **A:** Yes. You could not see it, but you could notice the bulge in his waist and also Darren's.
> **Q:** Aside from seeing the bulge, did you ever see a firearm?
> **A:** Yes. Once in a car Manuel and Darren were counting

---

[1] During his testimony, Nuñez-Rivera referred to Díaz-Correa by his nickname, "Manuel."

some money and I approached and asked him for $10.
**Q:** What type of firearm did you see?
**A:** He had a Beretta on top of his right thigh inside the car.

Nuñez-Rivera and Villafañe's testimony and the real evidence offered at trial provided more than enough evidence for a reasonable factfinder to conclude that Díaz-Correa had agreed with other leaders of the organization to use firearms to promote their drug-trafficking operation.

## B. Prosecutor's Misconduct During Closing Argument

Díaz-Correa argues that the prosecutor's conduct during closing argument was so inflammatory that it amounted to misconduct. We briefly review the events at closing argument before discussing the propriety of the prosecutor's actions.

In his closing argument, counsel for Díaz-Correa suggested that the "bulge" that Nuñez-Rivera testified he had seen in Díaz-Correa's waistband at Piñero was not necessarily the Beretta that Nuñez-Rivera saw later in Díaz-Correa's lap. Defense counsel suggested that the bulge could have been created by another object, such as a cell phone.

To respond to this suggestion during her rebuttal, the prosecuting attorney went to the evidence table and selected a pistol that had been entered into evidence. The pistol she selected was not a Beretta, and there was no evidence or allegation that it had ever been owned or carried by Díaz-Correa. Nevertheless, the prosecuting attorney held the gun in front of the

-13-

jury and said:

> And let's talk about the bulge.  You heard an argument
> that the bulge in the waist cover [was] a cell phone.
> Consider this, compare this cell phone with this pistol.
> And use your common sense.

Counsel for Díaz-Correa objected, and the district court agreed that the prosecutor's use of the gun was inappropriate, particularly given that the firearm selected was not the Beretta Díaz-Correa allegedly possessed.  The district court then instructed the jury "not [to] consider the pistol that was shown," but allowed the prosecutor to make her point that a cell phone was unlikely to cause the bulge seen by Nuñez-Rivera.

The term "prosecutorial misconduct" covers a broad swath of improper conduct by the state's attorney that may impair an accused's constitutional rights to a fair trial, such as commenting on an accused's decision to remain silent, witness vouching, and introducing inadmissible evidence through cross-examination.  See, e.g., Doyle v. Ohio, 426 U.S. 610, 619-20 (1976) (holding that it is improper for prosecutor to comment on accused's post-arrest silence); United States v. Vázquez-Botet, 532 F.3d 37, 53 (1st Cir. 2008) (discussing improper witness vouching); United States v. Hall, 989 F.2d 711, 716 (9th Cir. 1993) (discussing improper introduction of hearsay evidence through "artful cross-examination" and collecting cases).  In the closing argument context, a prosecutor's remarks or actions are improper where they "serve no purpose other than to inflame the passions and prejudices of the

jury, and to interject issues broader than the guilt or innocence of the accused." Arrieta-Agressot v. United States, 3 F.3d 525, 527 (1st Cir. 1993) (citation omitted) (internal quotation marks omitted). We are particularly sensitive to inappropriate conduct during rebuttal, when "the improper remarks [are] among the last words spoken to the jury by the trial attorneys." Ayala-García, 574 F.3d at 20 (citation omitted) (internal quotation marks omitted). Where, as here, defendant's counsel makes a timely objection to the prosecutor's conduct, "we review de novo whether the remarks amounted to prosecutorial misconduct." Id. at 16.

The prosecutor's actions in this case are an example of prosecutorial misconduct. Under these circumstances, taking a gun from the evidence table and brandishing it before the jury during rebuttal is obviously inflammatory. It should have been evident to the prosecutor that she should have broached with the judge the idea of presenting the gun to the jury in this provocative manner, thereby allowing the defense to register its objection. The court would have proscribed or modified the demonstration and the ensuing problems could have easily been avoided. Given that the gun used in the demonstration was not even the one allegedly owned or used by Díaz-Correa, a fact that the prosecutor knew, the prosecutor's behavior is all the more troubling.

It is also troubling that this demonstration was unnecessary. As the district court suggested, the prosecutor could have made her

point that a cell phone was too small to create the bulge just as easily by displaying the cell phone without the gun and asking the jury to use its common sense. Moreover, even without Nuñez-Rivera's testimony that he had seen a "bulge" in Díaz-Correa's waistband, there was more than enough evidence for the jury to conclude that Díaz-Correa had conspired to use guns in furtherance of the Piñero drug operation. Indeed, shortly after his testimony about the "bulge," Nuñez-Rivera testified that he had seen the Beretta in Díaz-Correa's possession on another occasion. It is important for a prosecutor to know when the potential costs of an argument to the jury or a demonstration far outweigh the need for it. Here, an impulsive and unnecessary decision by a prosecutor risked undermining all of the hard work of a seventeen-day jury trial, which was itself the product of a multi-year investigation.

Nevertheless, the Supreme Court has stated that where "the record, viewed in the aggregate, presents overwhelming evidence establishing [the defendant's] guilt . . . we are compelled to conclude that the prosecutor's improper remarks did not 'so poison the well that the trial's outcome was likely affected.'" United States v. Andújar-Basco, 488 F.3d 549 (1st Cir. 2007) (quoting United States v. Henderson, 320 F.3d 92, 107 (1st Cir. 2003); see also Vázquez-Botet, 532 F.3d at 59 ("[W]e are mindful of the Supreme Court's admonition that we not set guilty persons free simply to punish prosecutorial misconduct."); United States v.

-16-

Auch, 187 F.3d 125, 133 (1st Cir. 1999) ("[W]e heed the Supreme Court's admonition against letting the guilty go free to punish prosecutorial misconduct.") (citing United States v. Hastings, 461 U.S. 499, 506-507 (1983)). In this case, we are convinced that the evidence was so overwhelmingly on the government's side that the jury would have convicted regardless of the prosecutor's misguided demonstration. As such, the prosecutor's error was harmless, and we affirm the conviction.

### III. Sentencing Challenges

### A. Carrasquillo-Ocasio

After conviction, Carrasquillo-Ocasio faced a statutory mandatory minimum sentence of 10 years and a Sentencing Guidelines recommendation of 360 months to life. Finding that the sentence recommended under the Guidelines was greater than necessary, the district court sentenced Carrasquillo-Ocasio to 18 years of imprisonment. Carrasquillo-Ocasio appeals, arguing that his sentence should be remanded because of the Fair Sentencing Act and the district court's failure to make an individualized drug quantity determination. We examine each argument in turn.

### 1. Fair Sentencing Act

On August 3, 2010 President Obama signed the Fair Sentencing Act of 2010 ("FSA"), P.L. 111-220, 124 Stat. 3272, which reduced the disparity in sentencing between offenses involving crack cocaine and those involving powder cocaine. The FSA itself did not

address retroactivity, but in <u>United States</u> v. <u>Goncalves</u>, 642 F.3d 245 (1st Cir. 2011), <u>cert. denied</u>, 132 S.Ct. 596 (2011), we joined ten of our fellow Circuit Courts of Appeal in concluding that the FSA is not retroactive for the benefit of a defendant like Carrasquillo-Ocasio, whose criminal conduct and sentencing occurred before the FSA became law.  <u>See</u> <u>id.</u> at 253 n.8;[2] <u>see</u> <u>also</u> <u>United States</u> v. <u>Curet</u>, 670 F.3d 296, 309-10 (1st Cir. 2012) (re-affirming that "the FSA does not apply to individuals who were sentenced before the FSA was signed into law").

Carrasquillo-Ocasio was sentenced on July 12, 2010, shortly before the FSA became law.  On appeal, Carrasquillo-Ocasio urges us to overturn our decision in <u>Goncalves</u>, and hold that the FSA should be applied retroactively to reduce the sentences of those who, like him, were sentenced under the harsher pre-FSA mandatory minimums for crack-related offenses and whose appeals were still pending on

---

[2] We note that while the defendant in <u>Goncalves</u> was sentenced before August 3, 2010, statements in dicta suggested that this Court would apply the FSA regime only in cases where the offense conduct itself occurred after August 3, 2010.  That position is now precluded by the Supreme Court's decision in <u>Dorsey</u> v. <u>United States</u>, 132 S.Ct. 2321 (2012).  In that case, the Court determined that the more lenient penalties of the FSA applied to defendants who were sentenced after August 3, 2010, regardless of the date of their conduct offense or the date of their conviction or entry of guilty plea.  <u>Id.</u> at 2335.  In Carrasquillo-Ocasio's case, his offense conduct, his conviction, and his sentence all occurred before August 3, 2010.  Hence, the Court's decision in <u>Dorsey</u> is inapplicable to him.

August 3, 2010.[3]

There are only two circumstances, however, when a panel of this Court may overturn the holding of a previous panel. United States v. Malouf, 466 F.3d 21, 26-27 (1st Cir. 2006). The first is where supervening authority, such as an en banc decision, an opinion of the Supreme Court, or newly passed legislation undermines the decision of a previous panel. See United States v. Holloway, 499 F.3d 114, 118 (1st Cir. 2007); United States v. Allen, 469 F.3d 11, 18 (1st Cir. 2006). The second, which we have described as "hen's-teeth rare," occurs where "authority that postdates the original decision, although not directly controlling, may [] offer a compelling reason for believing that the former panel, in light of new developments, would change its collective mind." Malouf, 466 F.3d at 27 (internal quotation marks omitted). As Carrasquillo-Ocasio admits that no supervening authority exists and points to no "compelling reason" why the former panel would have changed its "collective mind," we decline to revisit Goncalves.

**2. Individualized Drug Quantity and Credibility Determination**

"When sentencing a participant in a drug-trafficking conspiracy, the district court must make an individualized finding

---

[3] While his appeal was pending, Carrasquillo-Ocasio moved for initial hearing en banc. On January 9, 2012, this court denied that request. United States v. Carrasquillo-Ocasio, No. 10-1931 (1st Cir. Jan. 9, 2012) (order denying request for initial en banc review).

concerning the quantity of drugs attributable to, or reasonably foreseeable by, the offender." United States v. Cintrón-Echautegui, 604 F.3d 1, 5 (1st Cir. 2010) (footnote omitted); see also United States v. Colon-Solis, 354 F.3d 101, 103 (1st Cir. 2004) (noting that in a drug conspiracy case a "defendant-specific determination of drug quantity" is a required "benchmark for individualized sentencing under the guidelines"). We review the question of whether the sentencing judge made an individual quantity determination at all de novo; if we determine that an individualized determination was made, our review is only for clear error. See Cintrón-Echautegui, 604 F.3d at 5.

At the sentencing hearing, the court made a clear individualized quantity determination, concluding that Carrasquillo-Ocasio was responsible for the entire drug quantity sold during the time he participated in the Piñero conspiracy from sometime in 2007 until early 2008, rather than the entire 2006-2008 lifespan of the conspiracy. The court stated: "[A]s to the specific drug amount. . . [i]f it had been conspiracy-wide, it would have been greater, but it's specific to his participation during the time he was present . . . . And let me note, it's different [from] other Defendants . . . This one specifically narrowed to his presence 2007 to early 2008."

Carrasquillo-Ocasio argues that it was error to attribute to him the entire quantity of drugs moved by the conspiracy during the

time he participated in the Piñero operation, rather than merely the drugs he personally sold or delivered. This argument misunderstands Carrasquillo-Ocasio's liability. As a member of a conspiracy, he was liable not only for the drugs "attributable" to him, but also to those "reasonably foreseeable by" him. Id. Evidence at trial indicated that Carrasquillo-Ocasio not only sold drugs at the drug point, but also that he was a "runner," responsible for moving drugs from the stash house to the drug point and for collecting and delivering cash revenues from the conspiracy. The district court was thus well within the bounds of reasonableness to conclude that the entire drug quantity moved through Piñero was "reasonably foreseeable" by Carrasquillo-Ocasio. There was no error.

Carrasquillo-Ocasio further asserts that our decision in United States v. Correy, 570 F.3d 373 (1st Cir. 2009), requires us to remand his case for resentencing because the district court failed to make an explicit credibility assessment of Nuñez-Rivera's testimony, which was the primary evidence given at trial as to specific drug quantities. In Correy, also a multi-defendant conspiracy conviction under section 841 where specific drug quantities were adduced from the testimony of a single witness, we remanded for resentencing because the district court judge failed to make a credibility assessment of that witness's testimony. See id. at 380-381.

Despite these facial similarities, Carrasquillo-Ocasio's reliance on <u>Correy</u> is misplaced. The factors that gave rise to our concerns in <u>Correy</u> are not present in this case. In <u>Correy</u>, a judge who had not presided over the trial presided over sentencing, and the transcript of the sentencing hearing suggested that the sentencing judge was not familiar with the trial testimony beyond what could be found in the pre-sentencing report ("PSR"). In this case, by contrast, the same judge who presided over Carrasquillo-Ocasio's lengthy trial also presided at his sentencing hearing and the sentencing hearings of many of his co-conspirators -- those who went to trial as well as those who pled guilty. The transcript of the sentencing hearing reveals that the court was intimately familiar with the facts of the case and the events at trial, and the district court's decision to credit the drug quantities in the PSR was an implicit decision to credit Nuñez-Rivera's testimony.

## B. Santos-Rivera

Unlike his co-defendants, Santos-Rivera challenges only his sentencing, not his conviction. Because Santos-Rivera had a previous conviction for felony drug possession, his conviction under section 841(b)(1)(A) triggered a mandatory minimum sentence of twenty years. While expressing his regret that he lacked the discretion to order a more lenient sentence, the district court reluctantly sentenced Santos-Rivera to 240 months. On appeal, Santos-Rivera asserts that the district court incorrectly

calculated his recommended range under the Sentencing Guidelines and that his sentence was unreasonable.

Both of Santos-Rivera's arguments, however, are foreclosed. The district court explained that it sentenced Santos-Rivera to the statutory minimum mandated by 21 U.S.C. §§ 841(b) & 851.  Unlike sentences imposed under the Guidelines, which are discretionary and require the sentencing judge to impose a sentence that is reasonable, a statutory mandatory minimum sentence is compelled by the text of § 841(b), which is a congressional mandate over which the trial court has no discretion.[4]  See United States v. Atonakopoulos, 399 F.3d 68, 75 (1st Cir. 2005) ("A mandatory minimum sentence imposed as required by a statute based on facts found by a jury or admitted by a defendant is not a candidate for Booker error.").  Because the district court had no discretion to impose a sentence less than 240 months, neither of Santos-Rivera's arguments would entitle him to any relief.  We have no choice but to affirm his sentence.

---

[4] Under the current Sentencing Guidelines, there are a few exceptions to the general rule that a statutory mandatory minimum applies automatically.  See e.g., 28 U.S.C. § 994(n) (mandatory minimums may be waived because of defendant's "substantial assistance" in a government investigation); U.S.S.G. § 5C1.2 and 18 U.S.C. § 3553(f)(1)-(5)(defendants convicted of certain crimes may avoid mandatory minimums if they meet certain criteria).  None of these exceptions is applicable to the instant case.

## IV. Conclusion

For the foregoing reasons, the judgments of the district court are <u>affirmed</u>.

**<u>So ordered.</u>**